IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

AMY MARIE KEMPER, as assignee  )
of CHRISTOPHER L. BROWN,        )
                                )
        Plaintiff,              )   CIVIL ACTION FILE
                                )   NO. 1:15-cv-2961-TCB
    vs.                         )
                                )
EQUITY INSURANCE COMPANY,       )
                                )
        Defendant.

        Deposition of PETER A. LAW, taken on

behalf of the Defendant, pursuant to the

stipulations contained herein, before Lynn Van

Ry, RPR, CCR No. B-1120, at 563 Spring Street,

Atlanta, Georgia, on July 8, 2017, commencing at

the hour of 11:04 a.m.

Q&A REPORTING SERVICES, INC.
Certified Court Reporters
2221 Peachtree Road, NE, Suite D-517
Atlanta, GA  30309-1148
404.233.3300    **   Admin@QAReporting.com

2

1    APPEARANCES OF COUNSEL

2         ON BEHALF OF THE PLAINTIFF:

3              RICHARD E. DOLDER, ESQ.
               Slappey & Sadd, LLC
4              352 Sandy Springs Circle
               Atlanta, GA  30328
5              404.255.6677
               rich@lawyersatlanta.com

6

7         ON BEHALF OF THE DEFENDANT:

8              PETER H. SCHMIDT, II, ESQ.
               Taylor, Odachowski, Schmidt & Crossland, LLC
9              300 Oak Street
               Suite 200
10             St. Simons Island, GA  31522
               912.634.0955
11             pschmidt@tosclaw.com

12

13

14

15                        - - -

16

17

18

19

20

21

22

23

24

25

3

1                    INDEX TO EXAMINATION

2  By Mr. Schmidt . . . . . . . . . . . . . . . . Pg  5

3

4

5                     INDEX TO EXHIBITS

6    EXHIBIT              DESCRIPTION              PAGE

7      *3        March 20, 2012, letter from Chop   51
                 to Kemper

8      *10       April 30, 2012, letter from Chop   51
9                to Kemper

10     *30       May 18, 2012 Email Black to        53
                 Werner re insurance
11
       160       Pete Law Report                     5
12
       161       Pete Law CV                         5
13
       162       Pete Law Invoice                   11
14

15   *Exhibits previously marked

16    All exhibits retained by counsel

17

18

19

20

21

22

23

24

25

4

1

2

3          (THE FOLLOWING TRANSCRIPT CONTAINS QUOTED
           MATERIAL; SUCH MATERIAL IS REPRODUCED AS
4          READ OR SPOKEN.)

5

6                          - - -

7

8          (IN THE FOLLOWING TRANSCRIPT, A DASH [ -- ]
           IS USED TO INDICATE AN UNINTENTIONAL OR
9          PURPOSEFUL INTERRUPTION OF A SENTENCE; AN
           ELLIPSIS [...] IS USED TO INDICATE HALTING
10         SPEECH OR AN UNFINISHED SENTENCE IN DIALOGUE,
           OR AN OMISSION OF WORD(S) WHEN READING WRITTEN
11         MATERIAL.)

12

13                         - - -

14

15

16

17         (Thereupon, the court reporter disclosed that
      she was there on behalf of Q & A Reporting
18    Services, Inc. in compliance with Article 10.B of
      the Rules and Regulations of the Board of Court
19    Reporting of the Judicial Council of Georgia and
      O.C.G.A. 15-14-37(a) and (b), the court reporter
20    discloses that she was retained by PETER H.
      SCHMIDT, II, to take down the proceedings.  Q & A
21    Reporting Services, Inc., will charge the
      attorney(s) the usual and customary rate for the
22    transcript and will be paid by the attorney(s) upon
      his/her(their) receipt of the transcript.)

23

24                         - - -

25

1                    (Marked for identification purposes,

2                    Exhibit No. 160.)

3                    PETER A. LAW,

4          being first duly sworn, was examined

5                and testified as follows:

6                    EXAMINATION

7    BY MR. SCHMIDT:

8          Q       We'll just go Pete and Peter, if that's

9    okay.

10         A       That sounds great.

11         Q       We know one another.  You've been

12   identified as an expert in the case involving Kemper

13   vs. Equity Insurance Company, and as you know, I

14   represent Equity.  I sort of want to work through

15   things a little bit here and go over some background

16   stuff initially.  Exhibit 161 that I'm showing you,

17   that is, as I understand it, a copy of your resume --

18   or CV; is that correct?

19         A       That's what I've provided in the case.

20   It's been updated a little bit, but it's still ...

21         Q       Okay.  Anything of substance as far as

22   this case goes?

23         A       No.

24         Q       Now, as far as your experience, obviously

25   most of your career has been as a lawyer.  Have you

6

1    ever worked for an insurance company or anything of
2    that nature, I mean actually been employee of an
3    insurance company?
4         A        No.
5         Q        Okay.  And you have no insurance
6    licensure or anything of that nature?
7         A        No.
8         Q        Now, as an expert, how many times as best
9    you can guess have you been retained as an expert to
10   testify in a case, or cases?
11        A        I want to say actually retained to --
12   now, there was a couple things, retained versus -- and
13   testify.  Retained, maybe three or four times.  I've
14   looked over a lot more than that, but I've only
15   accepted maybe three to four cases I would say, maybe
16   -- probably I would say, yeah, three or four.
17        Q        Okay.  Now, in your report, which is
18   161 -- or 160, pardon me -- I think you'd -- is it in
19   here, or was it in your --
20        A        I think it's in there, yeah.
21        Q        You listed two cases.  The third and
22   fourth -- I take it these are two of the three or four
23   that you're thinking of?
24        A        Yeah.
25        Q        And just for the record, I'm referencing

1  the two cases on page six of Exhibit 160.  Can you
2  recall what the other cases were that you --
3      A       Sure.  I have one currently I'm doing for
4  Carlock Copeland.
5      Q       Okay.
6      A       And then this one.
7      Q       Okay.
8      A       It's not on there.
9      Q       Fair enough.  And Carlock Copeland,
10 what's that one about generally?
11     A       That is a case which is pending, and I
12 don't know if it's been disclosed -- I know you
13 understand that --
14     Q       Yeah.
15     A       -- but I'll tell you the basics.  I'm
16 pretty sure it has been disclosed, but I should check
17 on that, involving a legal malpractice claim against a
18 local lawyer.
19     Q       Okay, all right.  And I take it, because
20 Carlock Copeland is involved, that's a defense case?
21     A       Right, it's a plaintiff's lawyer being
22 sued by another plaintiff's lawyer who is suing him --
23     Q       Gotcha.
24     A       -- for the underlying tort case, and Webb
25 Carlock has the defense of it now.  They approached me

8

1    about providing an opinion in that case.

2        Q        Okay.  And do any of your opinions that

3    you've provided in this case, do any of those

4    translate into, for that case at all, or are they two

5    different types of cases?  And I don't want to cross

6    into any confidentiality issues.

7        A        Yeah, I mean just to preserve, if we can

8    go off the record, I can tell you.  I don't mind

9    telling you.  I just don't want to step out of line.

10   If you agree to keep it confidential, I can tell you

11   the basics.

12       Q        Yeah, we can do that, we can go off the

13   record.

14                        (Brief off-the-record discussion.)

15   BY MR. SCHMIDT:

16       Q        And have you ever been retained by the

17   firm Slappey & Sadd before to assist in any, provide

18   any expert opinions?

19       A        No.

20       Q        How about Mike Werner?

21       A        No.

22       Q        Have you written any articles regarding

23   the opinions you're going to be offering here today?

24       A        I looked at my bio and the articles, and

25   there may be one or two that touch on it.  You know,

1    I've written so many articles and practices.  There's

2    one that I saw that was I thought pretty close, but I

3    would have to go through them.  Oh, I don't know, I

4    didn't look at the article -- I can't even say, Peter,

5    that I could bring it up -- but that one down at the

6    end of -- this should be numbered, but the one at the

7    third to last page, Your Professional Responsibility

8    when Civil Implications Can be Worse than DUI, that

9    may touch on one of my opinions.  But I don't really,

10   I don't --

11           Q       Where are you?

12           A       I'm at here.  I don't know if that would

13   be --

14           Q       Okay, got it.

15           A       -- talking about -- I had a question in

16   my mind, but I didn't go try to find that paper.  It

17   was so long ago, 2005, so 12 years ago.  I don't think

18   I even have it, but that could be an article that

19   could be ...

20           Q       Any others that stand out to you?

21           A       I mean they all kind of interplay with

22   the same type of issues.  But no, most of them are

23   about, you know, plaintiff's personal injury trial

24   practice.

25           Q       Yeah, that was sort of what I was

1  gleaning from it.

2      A       Yeah, yeah.

3      Q       And as far as any industry publications

4  regarding time limit demands or anything of that

5  nature, have you written any articles for any industry

6  publications, legal- or insurance-wise?

7      A       Not that I can recall.

8      Q       Now, looking at 160 here, the first page

9  there, one through six you've got listed several items

10 that you reviewed.  Have you reviewed anything other

11 than those items?

12     A       You know, I don't think so.  Your notice

13 of deposition I reviewed.  I have that here.

14     Q       Fair enough.

15     A       And then early on I want to say -- I

16 couldn't remember if I looked at the Holt, some of the

17 cases germane to it.  I think I did that initially

18 when I was deciding whether to get involved.  That's

19 on that thing I gave you there, I think, my billing

20 summary.  But other than that, no.  And it would have

21 been online, just -- you know, I work with those cases

22 so much.  I don't think, no.  What I'm relying on is

23 here in my file.

24     Q       Okay.  And just to touch on a few of

25 those items -- well, let me -- I'll come back to that.

1    And have you kept any handwritten notes or anything of

2    that nature, or is it all reflected in your report?

3        A       It's reflected in my reports, and then I

4    do have some notes.  And what I do is I'm a

5    highlighter, so you'll see a heavy highlight and then

6    occasionally I'll write a note with the highlighter.

7                And so -- I kind of got that from where

8    you and I started equally; Randy Moody was always big

9    on highlights.  So I have some notes, but it all will

10   be on this stuff.  As far as like a notepad or

11   something, not really.

12       Q       Fair enough, fair enough.  That'll now go

13   into the next question, and when we take a break, we

14   can mark this as 162.  And we're identifying that as

15   your billing statement, at least almost up to the

16   deposition time; is that correct?

17       A       Yes.

18       Q       Okay.  And does this basically reflect

19   your activity on this matter from the beginning to the

20   end of -- or until right before this deposition today?

21       A       Pretty much, yeah.

22       Q       Okay.

23       A       I mean I don't nickel and dime like you

24   and I used to at Drew Eckl.  So there might be an

25   email or a call or stuff setting up this deposition.

1      Q       Sure.

2      A       I think the call with you -- like, for

3  example, you and I had a call, I don't think that's on

4  there.  And so stuff like that, I don't, you know.

5  But yes, that's kind of the substantive stuff.

6      Q       And I think you said before we got on the

7  record that you may have spent another hour or two or

8  something of that nature; is that right?

9      A       Probably, yeah, yesterday.  And then this

10  morning I went back and reread Mike Werner's

11  deposition again, so that would be more time.

12      Q       How much would you guesstimate, not

13  holding you to it?  Would you say another four hours

14  maybe?

15      A       Sure.

16      Q       What I'm not seeing here, and I may just

17  be missing it and it may be incorporated in something

18  else here, but I'm seeing review and revise report,

19  but I'm not seeing where you actually initially

20  drafted the report.  Am I missing that somewhere, or

21  is that perhaps incorporated in other items?  I don't

22  know, I'm just not -- it's not jumping to me.

23      A       Well, that's kind of the problem with --

24  you know, my practice is I'll do things and I try to

25  put everything on as I can.  I drafted the report at

1   some point.  I can't remember when I did it.

2        Q        Okay.

3        A        And so I just, you know, being an expert

4   in these cases is not the primary way I make a living.

5   I know I drafted it, I just didn't know when, so I

6   just said -- you know, what I typically do is go to my

7   senior assistant, Brittany, and say, okay, I worked on

8   this Kemper file for 2.2 today -- you know, this is a

9   hypothetical -- put down review, review depositions,

10  and she adds it.  And then yesterday I asked her to

11  print it for me, and this is what she printed.

12           And so obviously I was contacted at the

13  beginning of this year.  Obviously at some point I

14  drafted the report.  I must have been busy that day

15  and not put that down there.  I would say, though,

16  there's probably less than an hour of time.  So it

17  might have just been that when she put review and

18  revise report, it just didn't, the word draft didn't

19  make it on there is likely what happened because

20  that's pretty accurate for my time.  What date was the

21  report filed?

22       Q        May 10th.

23       A        May 10th.  I probably did it the same

24  day.  I don't remember.  It might have been in a TC

25  with Richard Dolder probably is where it's -- I think

1    it would be on 4-25 is when it was done.

2        Q        That's fine, that's fine.  Now, I think

3    you've already sort of answered some of this.  Other

4    than looking at some of the cases, the Holt decision

5    you've mentioned and maybe some other decisions, did

6    you do any other independent research or anything of

7    that nature?

8        A        No.

9        Q        And as far as your report goes, the

10   actual report, I take it we can assume that those are

11   all your opinions and the only opinions you're giving

12   in this case; is that a fair statement?

13       A        Yeah, those cover the basics of my

14   opinions, yeah.

15       Q        And I take it -- I did see mention that

16   you spoke with Mike Werner at least one time.  But

17   other than that conversation with him -- strike that.

18            Have you discussed this case with any

19   fact witnesses other than Michael Werner?

20       A        No, but I don't even know that you would

21   consider that I discussed it with Mike Werner per se.

22       Q        Yeah, I was going to get there.

23       A        Yeah, yeah, yeah.

24       Q        Okay.  So as far as this conversation

25   that's referenced here with Mike Werner, was this

1  discussing any of his testimony or anything of that

2  nature that he'd given at that point?

3       A       No.

4       Q       This was just a preliminary conversation?

5       A       It was a conversation, and I remember

6  Rich, you know, is a pro, and he said I want you to

7  not talk to Mike, he's going to be on the call for --

8  he might not have been on the whole time, I don't

9  remember, but he's going to be on the call, I want you

10  to direct questions to me because he wants to preserve

11  whatever.

12       Q       Gotcha.

13       A       That was -- Mike was on the conversation.

14  Other than saying hey, Mike, how are you, how's it

15  going, you know.  You know, pleasantries with Mike.  I

16  know Mike like I know you, and, you know, if I bumped

17  into you, I'd say hey, how are you doing.

18       Q       Absolutely.  Now, in looking at your

19  report, picture-wise here, if I'm looking at it right,

20  I sort of look at three areas that you're providing

21  opinions on.  One is the appropriateness of Mike

22  Werner's actions.  Does that sound generally --

23       A       Yeah.

24       Q       And then the other was about what is and

25  isn't bad faith setup?

1    A        Yes.

2    Q        And then the third was a little bit more

3  floaty to me.

4    A        Yeah.

5    Q        And I just didn't -- I wanted you to sort

6  of explain that to me so I can put it in the proper

7  context of what that general opinion is because

8  that'll help me ask some follow-up questions.

9    A        Well, it's kind of clearly stated there

10  in number three on page four.  To explain why, I do,

11  and I have several cases where I represent the

12  functional equivalent of Chris Brown.  In other words,

13  I have provided a service forever to primarily Bubba

14  Head, you know, the legal DUI lawyer, for some of his

15  clients that have civil exposure in DUI or drug cases.

16             And so I will represent their personal

17  interests as their private lawyer, dealing with a

18  variety of issues on behalf of that person, Chris

19  Brown's position in this case.  I probably have three

20  or four right now.  I've done that for, gosh, as long

21  as I can remember, for Bubba, and a couple others.

22  And so that's what those opinions relate to.

23    Q        Okay.  So in giving those opinions there,

24  on that third item, are you -- I just want to make

25  sure I understand -- are you giving the opinion that

1    the insurance -- are you giving an opinion of the

2    duties and responsibilities of the insurance company

3    to hire separate counsel for the insured?

4        A        Not necessarily hire for them, but at

5    least make a recommendation that probably, yeah, would

6    have been different had Chris Brown had his own lawyer

7    and it should have -- given the totality of the

8    circumstances in this case, clearly Equity hired

9    several independent lawyers to advise them on this

10   whole thing, but nobody looked out for Chris Brown's

11   position as an independent lawyer, independent

12   insurance company.

13       Q        Okay.  But I guess what I'm saying is --

14   this is a bad faith lawsuit, so the question is are

15   you going to be offering an opinion that it was bad

16   faith for the insurance company not to have hired or

17   made available to Mr. Brown separate counsel?

18               MR. DOLDER:  Can I weigh in, do you mind?

19               MR. SCHMIDT:  Please.

20               MR. DOLDER:  Because he would offer

21           opinions based on our questions at trial.  And

22           we don't have any plans to ask Mr. Law any of

23           his opinions -- that I'm sure he has some, he

24           may hold some, but we're not going to ask him

25           his opinions on what the insurance company did

1           or didn't do.

2                 What we would ask him questions with

3           respect to this is what would an attorney who

4           was representing an insured do in this

5           situation and what sort of results does that

6           attorney see in that part of their practice.

7                 THE WITNESS:  Which is exactly what I

8           stated in my opinion, yeah.

9  BY MR. SCHMIDT:

10     Q     Okay, and I guess let me understand this

11 at this point in time because at this point we're

12 dealing with the demand -- and I want to focus it on

13 time periods here.  We're dealing with the demand that

14 was made and the response that Dave Chop sent.  I

15 guess who are you saying for that period of time

16 should have referred Mr. Brown to?

17     A     Well, a variety of people could have

18 recommended it.  In a lot of cases I will personally

19 -- and I have a lot of personal experience with this.

20 I have actually raised this because I have concerns,

21 reading testimony, that it wasn't raised by y'all

22 because I saw Bill Allred, I saw you, I saw McClellan,

23 everyone's looking out for Equity.

24     Q     Well --

25     A     Let me finish.  And so I raised that to

1    Rich in saying well, I represent people like Brown all

2    the time, and had they had somebody -- and I'll give

3    you an example.  I just did a case where Lane Young at

4    Hawkins Parnell recognized in a similar issue like

5    this, and he said I want to recommend him to get

6    personal counsel, and I'm going to send a letter to

7    the insurance company recommending that.

8              So in that situation, it was defense

9    counsel saying I want you to have your own independent

10   lawyer.  The insurance company ultimately hired, I

11   believe hired or got somebody, recommended, sent an

12   official letter, because they were afraid of coverage.

13             In other situations I'll push it, because

14   I know what's going to happen.  I'll say Peter, can

15   you please provide this letter to Mr. Brown.  And so

16   of course this was an individual at the time who

17   didn't know those kinds of things, Ms. Kemper.

18             So the issue is from an attorney's

19   perspective, I'm qualified to say what that lawyer

20   would have done in all, you know, in a reasonable

21   response to what was going on.  So it could be a

22   variety of situations where you'll get personal

23   counsel, happens all the time.  I'm sure you've seen

24   it in many cases.

25        Q     Yeah, my question, though, is at the time

1    the demand came in, okay, and by the time Chop sent a

2    response to it, who is it in your opinion should have

3    directed Mr. Brown to an attorney?

4              MR. DOLDER:  And again, Peter, that is

5         not a question that we would anticipate asking

6         Mr. Law at trial because that's not what we're

7         offering him for.  If you want to go off the

8         record, I'll actually explain to you.

9              MR. SCHMIDT:  Okay, I'll take you up on

10        it.

11                   (Brief off-the-record discussion.)

12   BY MR. SCHMIDT:

13        Q    Let's start this way.  We talked off the

14   record regarding ostensibly your third opinion

15   regarding having an outside -- or a separate counsel

16   connect with Mr. Brown during the period of time when

17   the demand was received and until the demand was

18   responded to; is that correct?

19        A    Happens all the time, yes.  But sometimes

20   we get involved before the demand is even made --

21        Q    Okay, I understand.

22        A    -- in a situation like this.

23        Q    And let me --

24        A    So how he gets to his personal lawyer is

25   not of consequence to me, just that he has one at some

1    point when he knows he has, when there's potential for

2    significant civil exposure.

3        Q        Okay.  In providing that opinion, I guess

4    your opinion is that would have been helpful; correct?

5        A        To Mr. Brown, yes.

6        Q        Okay.  But that is speculative to a

7    degree, is it not?

8        A        I don't think so.  I can tell you what a

9    reasonable attorney would do in response to a policy

10   limits demand in this situation.  And I've done it

11   many times in my practice for a long time.

12       Q        Okay.  But in giving your opinion, you're

13   not going to be testifying that it was incumbent upon

14   the insurance company to hire Mr. Brown separate

15   counsel at the very -- until -- during the period of

16   time up until the demand was responded to?

17       A        I think Richard just said that I'm not

18   going to be offering opinions on what the insurance

19   company -- he's not going to be offering me for

20   opinions on what the insurance company should be doing

21   in their own internal underwriting guidelines per se,

22   as you've said before.

23                Is that correct, Richard?

24                MR. DOLDER:  Yeah, I mean we as lawyers

25        will argue that Statewide should have hired an

1           attorney for Mr. Brown.  And then through a

2           series of hypotheticals we intend to get an

3           opinion from Mr. Law as to what might have

4           happened.

5    BY MR. SCHMIDT:

6           Q       Can you point me to any authoritative

7    materials, treatises, anything of that nature that

8    supports that opinion?

9           A       I think it's -- I see it commonly in my

10   practice where insurance companies will make a

11   recommendation to the functional equivalent of Mr.

12   Brown to hire independent counsel.  I certainly could

13   do the research and see if I could find something.  As

14   I mentioned earlier, I didn't do any independent

15   research.

16               So can I cite you Jenkins and Miller or

17   something right now on that issue?  No, I can't do

18   that as we speak.  I'm happy to do it if you want; but

19   it wasn't really, again, what the insurance company

20   should be doing germane to my opinions, although in my

21   experience what I see is germane to my opinions, and

22   that happens frequently.

23          Q       Okay.  And --

24          A       And one thing is whether it's hiring or

25   at least making the recommendation to say you may

1  want, you're free to get your own independent counsel,

2  you may want to do that.  You know, it's the age old

3  conflict that we've seen between insurance companies

4  and their insureds.

5        Q       But again, sitting here today, you cannot

6  identify any authority or guidance on the

7  appropriateness or the inappropriateness of that

8  specifically?  You're just testifying based upon your

9  experience?

10       A       Right, having handled cases like this for

11 20-plus years.  And like I said, I didn't do any

12 specific research to come up with authoritative texts

13 for you that I haven't already disclosed.  I'm happy

14 to do it, though, if you want.

15       Q       Now, as far as sort of going through

16 things that you're not going to be offering testimony

17 on, you're not going to be offering testimony on

18 insurance bad faith; correct?

19       A       Well, obviously --

20              MR. DOLDER:  I'm going to interpose an

21         objection on the basis of speculation.  You're

22         asking him to speculate to how he'll testify,

23         and the questions haven't been posited to him.

24 BY MR. SCHMIDT:

25       Q       Have you --

1      A       I was going to say some of these

2   issues will -- we're going to use the term bad faith

3   probably throughout this deposition, and so a lot of

4   the issues through Michael Werner's eyes and in my

5   disclosure would touch on it from a lawyer's

6   perspective, the reasonableness of a lawyer's

7   perspective and advising clients on bad faith and

8   things like that.

9      Q       You're not acting as a lien expert, are

10  you?

11     A       Again, I'll probably comment on liens and

12  Mike Walker's response to the lien situation in this

13  case.  Do I handle liens on a daily basis?  Yes.  Am I

14  offering -- you know, I think my report clearly states

15  that I'll comment on the lien situation in this case.

16  But am I being offered as a lien expert from --

17              MR. DOLDER:  I think I just would like a

18         standing objection if you don't mind, Peter,

19         because I don't want to interrupt the flow of

20         your questioning.  But to the extent you

21         preface a question with are you being offered

22         to, you're asking him to speculate as to how he

23         is going to answer questions at trial that he

24         hasn't been asked yet.

25  BY MR. SCHMIDT:

1    Q        Well, I mean under the Federal Rules, I'm
2    entitled to know what opinions you're going to offer.
3    And so I guess my question is geared are you offering,
4    are you offering opinions as a lien expert in this
5    case?
6    A        Well, I think my opinion number one
7    clearly states that Mike Werner's reaction and
8    reasonableness in what he did in response to, for
9    example, 1 h., in response to the lien.  So if you
10   consider that as an expert opinion surrounding a
11   lien --
12   Q        Well, I guess my question is are the
13   opinions that you're going to be giving relative to
14   liens relative to what an attorney would do versus
15   someone who is a lien expert, so to speak.
16   A        As I understand you to mean it, I don't
17   think I'm being offered as a lien expert.
18   Q        Right.
19   A        I'm being offered on what Mike Werner,
20   you know, how he handled that issue as it came up in
21   the case.  Is that fair?
22   Q        Fair enough, fair enough.  Yeah, and
23   that's the same for the escrow account issue as well,
24   I take it; is that a fair statement?  You're not being
25   offered as an escrow expert; you're being offered to

1    say how an attorney might deal with an escrow issue?

2         A         How it relates to the totality of the

3    circumstances in this case, yes.

4         Q         Okay, okay.  Now, are you offering any

5    opinions regarding, or do you anticipate offering any

6    opinions as to Mr. Brown's defense, underlying defense

7    in the case?

8         A         I certainly have opinions, and my report

9    would identify anything that I have in that regard.

10   It may touch on that.  But am I being offered like Mr.

11   Wetzel should have done this?  No.  No, I'm not saying

12   that he should have or shouldn't have done anything,

13   if that's the question.

14        Q         That was where I was going, yeah.  Now, I

15   should have gone back to this.  On your report, you

16   listed several cases.  I don't know if I gave you

17   mine.

18        A         Yeah, here.  You can have this one if you

19   want.

20        Q         No, here it goes.  You've identified

21   those two cases there.  I should have asked you about

22   this.  The first one is the Monitronics, Monitronics

23   case versus Hall Booth.  Does that involve time limit

24   demands or anything of that nature?

25        A         I honestly don't recall.  I don't think

1    that came up in the case, but I would have to read the

2    deposition to answer that question.  I don't think we

3    touched on time limit demands, although I know I did,

4    I think I did comment on that.  But no, I don't think

5    I was an expert in that regard.

6        Q       Okay.  And as far as the Wells vs. Asian

7    Commons case, what was that about?

8        A       That was a case that I testified at trial

9    as an expert on the reasonableness of attorneys' fees.

10       Q       Okay.  And was that your own case?

11       A       Yes.

12       Q       Okay, so you were standing in your place

13   as far as the reasonableness of your fees?

14       A       Well, I was actually on the stand and

15   took an oath and my law partner, Mike Moran, examined

16   me.

17       Q       Okay.

18       A       So I testified at trial, in the trial I

19   handled.

20       Q       But I guess what I'm saying, you weren't

21   acting as a -- it was a case in which you had a

22   financial connection to versus being an independent

23   expert in this case?

24       A       Right.

25       Q       That's all I'm saying.

28

1        A        Yep.

2        Q        Okay.  And as far as Monitronics, what

3    was the issue in that -- or what is the issue I guess

4    in that case?

5        A        Well, there's a lot of experts in that

6    case, so there are a lot of issues.

7        Q        Okay.

8        A        What do you want me to tell?

9        Q        Well, I guess -- give me a general

10   overview of what the case is about as you understand

11   it, more or less.

12       A        Well, I understand it in great detail,

13   and I think you understand it as well.  Have you had

14   an opportunity to get the deposition in that case?

15       Q        No one will give it to me.  You've beaten

16   them to a pulp.

17       A        Okay.  Is it one of those things that you

18   would feel comfortable with me telling you off the

19   record?  I want to keep it confidential --

20       Q        Yeah.

21       A        -- because that case is pending.

22   Anything that's public disclosure you can have --

23       Q        Sure.

24       A        -- but it's one of those sensitive cases

25   that's still pending.  You know, if you're comfortable

1   with that.  I just don't want to -- you know, Peter, I
2   don't want -- and you don't want me to violate any
3   confidences and things like that.
4       Q       No, we can go off the record and you can
5   tell me.
6                       (Brief off-the-record discussion.)
7   BY MR. SCHMIDT:
8       Q       As far as the Monitronics case, the
9   issues involved in that case surround providing --
10                  MR. DOLDER:  Is that --
11                  MR. SCHMIDT:  I'm giving a broad -- I'm
12          not saying what he's saying.  I'm just giving a
13          broad topic --
14      A       I didn't tell you anything confidential,
15  but if it even gets close to the line, you're not
16  going to repeat it.  You're going to give a broad
17  topic that was I believe filed in federal court on
18  what that case is about.  That's a public case.
19  BY MR. SCHMIDT:
20      Q       Yeah.  All I was going to say is as far
21  as that case goes, that case involves issues relative
22  to providing pretrial notice of third-party liability
23  and defense strategies in a civil security case.  Does
24  that sum it up without getting into the specifics?
25      A       Sure, that paints with a broad brush,

1    thank you.

2        Q        I wasn't trying to muck anything up

3    there.  Have you ever testified in any nonlegal

4    malpractice situations regarding the actions or

5    inactions of another lawyer?

6        A        I think so.

7        Q        Okay.

8        A        In bad faith cases of my own.  So I'm

9    sure I would have commented what the defense lawyer

10   did or what happened.  I'm trying to be as honest as I

11   can.  I've had --

12       Q        No, no, I'm talking about as an expert, a

13   testifying expert.

14       A        Oh, I thought you said as a nonexpert.

15       Q        No, what I'm saying is as an expert in a

16   non-malpractice situation involving an attorney, have

17   you ever given testimony regarding the actions of

18   another lawyer?

19       A        I don't think so.

20       Q        Okay.  Have you ever acted as an expert

21   in any case involving an alleged time limit demand

22   where a claimant said do not call in so many words to

23   an insurance company in making a demand?

24       A        Have I acted -- I don't recall

25   anything -- I don't recall that.

1      Q       Have you ever testified as an expert in
2  any case regarding bad faith setup?
3      A       I don't recall testifying on that exact
4  issue.
5      Q       Have you ever testified as an expert
6  regarding the use of escrow accounts with respect to
7  time limit demands?
8      A       I don't think I've testified in regard to
9  anything like that.
10      Q       Have you testified in any cases as an
11  expert regarding the scope and limits of a limited
12  liability release?
13      A       I don't think so.
14      Q       Have you ever testified as an expert in
15  any case involving the appropriateness or
16  inappropriateness of how to handle medical liens or
17  any other third-party interest in any insurance
18  proceeds?
19      A       Testified as an expert, no.
20      Q       Have you testified in any cases as an
21  expert which involved pre-suit demands by pro se
22  claimants?
23      A       I don't think so.
24      Q       Have you ever provided testimony
25  regarding -- as an expert -- regarding the

1  reasonableness or unreasonableness of a claimant's

2  demand?

3       A       Have I had to testify as to the

4  reasonableness of a demand in a plaintiff's case?

5       Q       Have you testified as an expert as to the

6  reasonableness or unreasonableness of a claimant's

7  demand?

8       A       I think other than the Monitronics, that

9  might have come up there, I might have said something

10  about it there.  But other than that ...

11       Q       So no other than Monitronics?

12       A       Right.  You keep asking if I testified.

13  I've listed the few times I've testified as an expert.

14       Q       Understood, understood.

15       A       And we've already excluded all of these

16  questions from that.

17       Q       Now, I want to talk a little bit about

18  you as a plaintiff's lawyer and when you get a new

19  matter in similar to the Amy Kemper case, let's say,

20  for example, and under those circumstances, what is

21  the information that you want as a plaintiff's lawyer

22  before you are making a bad faith demand?  What is it

23  that you're wanting or needing to assemble a bad faith

24  demand?

25       A       I would normally object to that.  But I

1   mean you don't really make a bad faith demand.

2        Q        I'm sorry, I meant time limit demand.

3   Let me start all over again.  Thank you.  Strike that.

4               MR. DOLDER:  Long drive.

5               THE WITNESS:  Was that what you were

6          trying to --

7               MR. DOLDER:  I was trying to figure out

8          what the proper objection was because I can't

9          object to the form.

10              THE WITNESS:  I was going to figure out

11         if I could object.  Okay, go ahead.

12              MR. SCHMIDT:  I appreciate it, guys.

13              THE WITNESS:  You're good.  It's all

14         good.  We get what you mean.

15  BY MR. SCHMIDT:

16       Q        What my question was meant to be was as

17  far as a plaintiff's lawyer anticipating making a

18  pre-suit time limit demand, what is it that you want

19  to have together as far as information and details

20  before making a time limit demand?

21       A        Well, you want to have the police report.

22  It depends because it could be if you have clearly a

23  case where there's not enough insurance to cover the

24  injuries, for example, you said, like this Kemper

25  case, a lot of times I'll have this case and there

34

1    will be $25 million of insurance, so it's a different

2    set of analysis.  But in this case I want to know,

3    have a sufficient quantum of evidence to know that

4    it's going to exceed the limits, that there's no other

5    insurance available, what it is, such as UM, a basic

6    quantum of evidence that -- and I say it in regards to

7    getting medical.

8                You know, I would have done exactly what

9    Mike Werner -- and I do -- did in this case, is I

10   wouldn't have ordered all the medical records.  That's

11   very reasonable and common.  I do that all the time.

12   I wouldn't have spent 1500 or $2,000 -- and Mike

13   testified to this -- of telling her to get the medical

14   records when there was no need to in this case, and

15   that's common.

16                So I would get a sufficient quantum of

17   evidence to know that there's no other sources of

18   potential recovery and, you know, the basics, other

19   than you, you know, you ask the client her age, where

20   she works, you know, what she does or whatever, that

21   kind of thing.

22        Q    What about dealing with issues of any

23   liens, hospital, medical liens, things of that nature,

24   how would you deal with that situation?

25        A    It changes on a case-to-case

1   circumstance.  For example, in this case, Mike was

2   accurate and immediately spotted that there would be

3   no liens.  She had received no liens.  She indicated

4   she didn't, was aware of no liens.  So you basically

5   ask your client questions and see if there's any.  You

6   can go to the courthouse and see if any valid liens,

7   valid and enforceable liens have been recorded.  So as

8   it relates to liens, you just ask preliminary

9   questions.

10      Q       What about health insurance, things of

11  that nature, when she's got health insurance through

12  her employer as we know in this particular case, what

13  questions would you ask relative to that?

14      A       Have you received, you know, I guess, I

15  don't know, what do you mean, are they paying your

16  bills, or is there any problems with it, is that what

17  you're asking?

18      Q       I'm focusing more on subrogation rights

19  and things of that nature to the extent that a

20  healthcare provider would have a subrogation right

21  against any proceeds that may be paid as part of a

22  time limit demand.  Does that make sense?

23      A       Well, I wouldn't ask her that, you

24  know -- well, it doesn't really make that much sense

25  to me.  So at what point in the stage would I ask that

1  question?

2        Q       Yeah, I mean assuming there may be a

3  subrogation right, what do you do to find out if there

4  is a potential or is a subrogation right from a

5  healthcare provider?

6        A       Well, I ask the client primarily, have

7  you received notice of a subrogation, as a lawyer is

8  how often I will do it.  Do you have health insurance.

9                A lot of times I may, if appropriate,

10  send a letter directly to the health insurer, and then

11  that usually prompts it.  They're pretty good at

12  letting you know if they have a subrogation interest

13  these days.  They have all kinds of companies that'll

14  --

15        Q       You're talking about, they're good about

16  it, the healthcare providers is what you're saying?

17        A       Right.

18        Q       Yeah.  So you'd ask the client first, and

19  if they didn't know, then you'd contact the employer

20  or their carrier, I guess?

21        A       Well, I didn't say I'd contact their

22  employer.  But I do often sometimes, if appropriate, I

23  do contact the employer.  I might contact the actual

24  carrier is what I thought I said.  But yeah, you

25  could, you know, you're going to try to prove your

1   lost wages claim if that's needed.  Like in this case,

2   obviously it wasn't needed, so there would be no

3   reason for him to contact the employer under the

4   circumstances of this case.

5        Q        Would you want to contact the insurer to

6   know whether or not there were subrogation claims?

7        A        Not always.  There's a belief among

8   lawyers that you don't do that.

9        Q        Okay.  And why is that?  What's the

10  belief?

11       A        Because if they're not asserting it, why

12  wake a sleeping giant and get them to assert it.

13       Q        Okay.

14       A        It's their duty to assert it.  Your duty

15  is not to try to help the health insurer make a

16  subrogation interest.  Your duty is to legally comply

17  with any notices or requirements that your client may

18  have.  And so that's why there's a belief among

19  plaintiffs' lawyers, don't wake a sleeping giant, as I

20  said.

21            Now, a lot of times that changes,

22  depending on, you know, the circumstances in the case.

23  If you have Wal-Mart, it might make a different set of

24  circumstances because you're probably not going to do

25  a very -- as Mike said, you know, if you saw her

1   deposition, he immediately told her you're screwed,

2   there's not enough insurance to cover, and they're

3   going to pay it right away.  So in that situation you

4   may not contact the insurance company once you know.

5   If they haven't exercised their right, a lot of times

6   you have good insurers that don't do it.

7        Q        That have the right and don't do it?

8        A        Right.

9        Q        But if you don't find that out and you

10  don't disburse the money, can they go after those

11  monies in any way, shape, or form?

12       A        No, not -- well, that's a qualified

13  response, of course.  It depends on the plan language

14  and it depends on what -- it depends on a lot of

15  stuff, and now you're getting into lien expertise that

16  you're asking me about what they can go after.

17                Just depends on a lot of different

18  factors.  Did you try to hide from them that she was

19  laying in the hospital and it was a result of a

20  motorcycle accident, you know, from a drunk driver;

21  did you -- you know, all these kinds of things as to

22  whether they can make a claim or not.  What your plan

23  says is really primary, does your plan require you.

24       Q        You'd want to know what the plan says?

25       A        Not necessarily.

1      Q      But you could?

2      A      I could do anything, I mean in a case if

3   I needed to.  If the case demanded it, I could do

4   anything, I mean, you know.  In this case, as we come

5   back to this case -- because this is kind of a vague

6   hypothetical -- in this case I think Mike handled it

7   perfectly.  I would have done exactly what he did.

8      Q      Now, when you're handling -- and I'm

9   talking about you representing a claimant in a

10  pre-suit, is it normal to discuss the claim with the

11  insurance adjuster that's handling the claim, if you

12  know who that is?

13     A      Again, it depends.  I don't personally

14  like to talk to the insurance adjusters that much.  So

15  I have many cases where I don't.

16     Q      Is there a reason that you don't?

17     A      When you have a significant injury, are

18  you really going to get anywhere with these adjusters,

19  and often it's a one-way street.  And I really have no

20  duties to the opposing party's liability insurer.  My

21  duties go to my client.  So a lot of times it's just

22  doing, I find that you're doing, you know, their job

23  for them.

24             If I have a catastrophic injury case, you

25  know, I don't really need to talk to them much other

40

1   than to find out how much coverage there is.  If I

2   have that information -- and there's a million

3   different hypotheticals that could come up in your

4   hypothetical, like did you take it over from another

5   client; is the client pro se, like in this situation

6   where you're saying look, you don't need to -- you

7   don't need me.  I do that a lot, you don't need me.

8   You can get the money.  You don't need to pay a third

9   of this, which is a gigantic chunk of it, for a

10  lawyer.

11          And so in that situation, no, I wouldn't

12  talk to them.  Now, if I had -- and I have this.

13  Let's say, you know, the world's largest corporations,

14  I may call and start posturing with them where there's

15  an endless amount of insurance.  So it just depends

16  on -- it depends, whether I want to talk to the

17  adjuster or not.

18      Q       But as far as the claim handling process,

19  you agree that there has to be some communication

20  between the claimant and the insurance company,

21  doesn't there?

22      A       To notify them of the claim for sure and

23  to get the insurance limits.

24      Q       Okay.  Is there any responsibility of the

25  claimant to do anything as far as offering or giving

1    any documents or information or records to the

2    insurance carrier in your opinion?

3         A       Are you talking for a demand, or are you

4    just talking in general?

5         Q       In general.

6         A       So let me see if I understand this

7    correctly.  Do my clients have a duty to provide to

8    the opposing insurance company medical bills or

9    anything like that?

10        Q       Yeah.

11        A       I don't think they have a duty to do

12   that.

13        Q       Okay.

14        A       Now, for -- in just general.  Now, you

15   excluded demand from that.  So if you're doing a

16   demand, you want to make sure you're giving a

17   sufficient quantum of evidence to, you know, a

18   reasonable amount of evidence so that they can make a

19   decision.  But you excluded demand from that.

20        Q       So you think without a demand it would be

21   your opinion that there's no obligation of a plaintiff

22   to provide an insurance company supporting documents

23   or records of their insurance claim?

24        A       Well, what do you mean by insurance

25   claim?  What are they claiming?

1        Q        Their injuries.

2        A        Well, the way you claim the injuries is

3   you make a demand for payment once you're at a point

4   to do that.

5        Q        I understand that.  But oftentimes, as I

6   think you know, is insurance companies will write to

7   insureds and say send me whatever medical bills you've

8   got or anything of that nature.  Under those

9   circumstances, is there any obligation of an insurer

10  -- pardon me, claimant, to provide those documents and

11  records?  I'm talking about before a demand.

12       A        Well, I don't know if there's any

13  obligation, I don't know if it will have adverse

14  consequences.  But is there like a law that you have

15  to provide them that stuff at the time this was going

16  on or at any time?  Not necessarily.  A lot of times I

17  ignore those letters.  I'm not ready to give them.  I

18  don't have them.  And so I have no duty to communicate

19  with the liability.

20                Now, UM is different.  You're not asking

21  about UM.  Is it great practice?  Well, you're

22  probably not going to win friends with the adjuster

23  and get your case settled if you're not cooperating.

24  But do you have a duty to cooperate?  No, that's with

25  the tortfeasor and his carrier.  So I agree with Mike

1    Werner where he said in his deposition, she had no
2    duty to give them, you know, to cooperate with --
3    something to that effect, we can go to the exact
4    testimony -- with the liability carrier.  So is that
5    your question?
6          Q        It's good enough.
7          A        I provide notice, if that helps you, to
8    the liability carrier, and I think that's good
9    practice, to make sure that they're aware of the
10   claim.  Oftentimes I'll send the report.  Many times
11   my next communication is the demand.
12         Q        Do you ever tell claimants to ignore
13   document requests from insurance companies?
14         A        Yes, I tell them to send them to me and
15   not to talk to the insurance company.
16         Q        And why is that?
17         A        Because I want to handle it.  I don't, I
18   don't -- I think the general perception is, and I've
19   seen it in my practice, that people don't always trust
20   what the insurance company is doing.  So do I tell my
21   clients to just -- yeah, don't talk to them, ignore
22   them.  Call me -- if they call you, tell them to call
23   me.
24         Q        But regardless, as far as the claim
25   process goes, there has to be some amount of

1   communication to get a case resolved short of suit;

2   correct?

3       A       If you want to resolve your case before a

4   lawsuit, yes, you need to communicate with the other

5   side's insurance company.  Somebody needs to or they

6   need to make sure they have the information.  I think

7   oftentimes it's done with a demand.

8       Q       Now, bad faith setup, on that issue,

9   explain for me if you would what bad faith setup is.

10      A       Well, it has differing meanings to

11  different sides of the line and things like that.  And

12  I'm not really a strong believer that there is a real

13  strong bad faith setup in existence.  Either an

14  insurance company accepts a reasonable demand or it

15  doesn't and has the evidence to make an informed

16  decision.

17              So really, like in this case, as it

18  relates to my opinion, not only do I not think there

19  was any setup, there's no evidence that there was a

20  setup, but there's a good bit of evidence that it

21  wasn't a setup.  And so, you know, a setup is trying

22  to make things appear other than it is or to try to --

23  I guess you guys like to say trying to trick the

24  insurance company into not paying a demand.  But I

25  don't think that that's as prevalent or even --

1        Q        Well, I guess what does it -- I mean in

2    your experience, can you give us an example of what a

3    bad faith setup is?

4        A        Sure.  I've seen lawyers perhaps play

5    games with the time, send a demand on December 24th

6    and say you have five days, you know, and maybe hold

7    the letter a day or two.  You know, that's like a

8    time -- you can play with the time perhaps.  I don't

9    really know if lawyers do that much, but maybe that

10   would be an example that I've seen cited.  Or

11   perhaps -- the way I think of it often is they try to

12   make it seem like it's a closer call to the limits

13   than it really is.

14       Q        Explain that to me.

15       A        Well, you don't really send a sufficient

16   or a reasonable amount of evidence so the insurance

17   knows this is clearly a limits case, and they try to

18   downplay the damages is the way I think of a setup

19   from a plaintiff's perspective is try to almost lure

20   the insurance company into not paying the limits.

21   From --

22       Q        Have you -- go ahead, I'm sorry.

23       A        No, go ahead.

24       Q        No, you finish.

25       A        I mean I could give you more, but yeah,

1  go ahead.

2      Q      And in those cases, for example, the

3  time, playing with the time or whatever it is, you

4  know, what's the goal, to make them miss the deadline

5  and then they say they're in bad faith basically?

6      A      Presumably that would be a setup, in that

7  hypothetical.

8      Q      Have you -- I think I've already asked

9  you this.  You've not written on that at all, have

10 you?

11     A      I don't think so.

12     Q      And what qualifies you to give an opinion

13 on bad faith setup?

14     A      Having practiced in this field for 24

15 years, having been in a lot of seminars, attending a

16 lot of CLE's where Holt demand has come up.  I was in

17 -- I don't want to say -- I don't want to overplay my

18 role, but obviously with legislative issues and some

19 of the organizations, I've been around the courthouse,

20 been around the legislature when these issues come up

21 and the statutes pass.  You know, I stay very abreast

22 of the plaintiffs' lawyers happenings in our industry

23 and industry standards.

24            And so, you know, I've had a lot of bad

25 faith excess verdicts over my career in recoveries,

1  settlements as well.  So I've just been around it.  I

2  mean it's just the same way you are, I mean I've

3  just --

4        Q       Yeah, I guess -- and I don't mean

5  anything rotten by this, but have you ever tried to

6  set up an insurance company --

7        A       No.

8        Q       -- in bad faith?

9        A       No.  I avoid that.  I avoid anything that

10 would get close to that.

11       Q       Have you ever litigated the issue of bad

12 faith setup?

13       A       Have I litigated whether it was a setup.

14 I can't answer that without reviewing one file, but I

15 don't think that was raised in that case.  But I've

16 handled bad faith cases, and I don't know if it was

17 raised in that case or not.

18       Q       Have you ever spoken on the issue -- I

19 think we may have covered that already -- on bad faith

20 setup?  And I think you said no.

21       A       I mean I've spoken certainly on how to

22 handle plaintiffs' personal injury claims.  You see

23 that and have a way to do things like that and, you

24 know, the best way to make demands and the best way to

25 do your practice.  I've spoken a lot on practice

48

1    management.  And so I probably have commented on that

2    to the various CLE groups I've spoken on on how to

3    properly make a demand and what's a proper demand.  I

4    know I've spoken on that, or things regarding demands.

5         Q       But have you ever --

6         A       But have I written a topic -- I'm sorry,

7    Peter.  Have I written a topic that said -- no, I

8    haven't written a paper specifically related to

9    insurance setups, which again, I don't really

10   necessarily know that there is such a thing as a

11   setup.

12        Q       I mean if you were to try to explain to a

13   lay person what bad faith setup is meant, how would

14   you explain that?  How would you explain the concept

15   of bad faith setup on a time limit demand?

16        A       Well, again, like I said, I don't even

17   know that I agree that there is such a thing exists.

18   Either the demand is reasonable or it's not, and

19   either the insurance company responds reasonably or

20   not.  But if I was to use it the way we use it in our

21   industry, it would be exactly as I said, as we've

22   talked about the last couple of minutes, is trying to

23   induce the insurance company to not pay a policy

24   limits demand when they clearly should have.

25        Q       And you'll agree in this case, Statewide

1    actually did pay the limits.  I mean I'm not saying

2    that there were other issues with it, but it did pay

3    the limits; correct?

4        A        Well, they didn't pay it, but they

5    tendered it at some point with a counteroffer, yeah, I

6    know that they -- they recognized they needed to put

7    it up.

8        Q        So I mean there's no -- I don't want

9    there to be any misunderstanding.  You're not saying

10   that they were refusing to pay their policy limits?

11       A        They were refusing to pay their policy

12   limits because they imposed conditions as a precedent

13   to paying those policy limits.

14       Q        But they actually did physically deliver

15   the check of the limits to Ms. Kemper; correct?

16       A        With conditions that --

17       Q        Understood.

18       A        -- that were not reasonable.

19       Q        And that's your opinion, that aren't

20   reasonable?

21       A        Mine and the court of appeals too.

22       Q        Well --

23       A        Yeah, I'm sorry, yeah, you're right,

24   you're right.

25                MR. DOLDER:  We have been going for more

1          than an hour.

2                    MR. SCHMIDT:  We can take a break.

3                    MR. DOLDER:  I don't need it.  I'm

4          pointing it out to the witness.

5                    THE WITNESS:  I'll take one.  I'll take

6          one.

7                    MR. DOLDER:  Do it.  Do it.

8                         (Recess from 12:20 to 12:27 p.m.)

9    BY MR. SCHMIDT:

10        Q      Now, in this case, are you aware that

11   David Chop wrote Ms. Kemper twice on -- once on

12   March 20th and once on April 30th, regarding the

13   claim?

14        A      Those are exhibits to the depos, I have

15   those already, I've seen those; right?

16        Q      Yes.  So you're aware of that?

17        A      I'm pretty sure if they're attached.

18   Now, I remember one specifically, but let's -- do you

19   want me to --

20        Q      You can.  I mean I've got --

21        A      Are you telling me that that definitely

22   happened?  I'm pretty sure it did.

23        Q      I can actually show you the letters.

24        A      I've got them.  And I've looked at every

25   one of them.

1      Q        Exhibits 3 and 10.

2      A        Yeah, those are them.  Yeah, I've got

3  them.

4      Q        And you understand that Ms. Kemper did

5  not respond to either of these letters; is that your

6  understanding?

7               MR. DOLDER:  Objection; it misstates

8         evidence.

9      A        Right, there's a couple of things if you

10  want me to, you know, honestly -- first of all, she

11  was in the hospital I think on both of those, so she

12  may not have received them.  But I think Ms. Black was

13  her power of attorney and may have responded in that

14  regard.  And then I don't know, do you count the

15  demand as responding.  I certainly would.  So I've got

16  to qualify the question.

17  BY MR. SCHMIDT:

18      Q        Okay, well, let's go through them then.

19  Have you seen any communication in which Ms. Kemper,

20  between March 20th, 2012, and April 30th of 2012, had

21  any communications with Statewide?

22      A        Not Ms. Kemper.  The only communication I

23  have from her is her demand, which is Exhibit 8.

24      Q        Okay.  And with respect to the

25  April 30th, 2012 letter, are you aware of Ms. Kemper

1    or anyone on her behalf ever providing the materials

2    that are detailed or requested as part of that letter?

3         A       There's some testimony that Ms. Black

4    gave them.  I don't think that that's actually -- I

5    don't know whether it's correct or not.  But there's

6    some testimony that Ms. Black gave some of that stuff

7    because we know that Equity had some of the medical

8    bills, like the life flight, the helicopter,

9    beforehand.  So that's another question that is

10   subject to qualification, just -- I don't know if

11   Ms. Black did it on her behalf or if someone did.

12        Q       Okay.  But my question is did Ms. Kemper

13   respond to this letter herself and provide any

14   documents or records?

15        A       Let me see this letter again.  I know she

16   responded with the demand.  So she probably had some

17   of the information, I believe.  But no, did she

18   respond specifically I received your April 30th

19   letter?  I didn't see anything like that.  The only

20   thing I saw was the demand.

21        Q       Now, the next thing was the demand

22   letter, as you pointed out.

23        A       Yep.  I've got my version right there.

24   Did you guys run consistent -- oh, here, there's the

25   30.

1     Q       Well, we changed it halfway through on

2   the exhibits.

3     A       Okay, I thought so because I knew, I know

4   I've got --

5     Q       But I brought it just in case.

6     A       I've got it right there.

7     Q       And you understand that Exhibit 30, as

8   we're calling it, is the demand letter that Ms. Kemper

9   penned with Mr. Werner with her, to Mr. Chop; correct?

10    A       Yes.

11    Q       And do you have an understanding of the

12  highlighting on this particular letter and the meaning

13  of that?

14    A       Yes.

15    Q       What is your understanding of that?

16    A       Those are the parts that Mike Werner

17  provided input on.

18    Q       Now, in sending the Exhibit 30 letter,

19  you understand Ms. Kemper without Mr. Werner's help

20  didn't understand some of the verbiage and the content

21  that was part of that letter; correct?

22    A       I saw that testimony.

23    Q       And she was actually relying on his input

24  on that; correct?

25    A       I think that would be a fair summary of

54

1  what she said.

2      Q      Now, you would agree with me that no

3  release was accompanying the letter, correct, the

4  Exhibit 30?

5      A      I would agree.

6      Q      Okay.  And no liens are mentioned as part

7  of that letter, are they?

8      A      She does not use the word liens.

9      Q      Okay.  Does she say or mention or provide

10 any explanation as to how any liens to the extent that

11 they existed would be handled?

12     A      I mean the document speaks for itself.

13 Let me read it again.  I don't think she says anything

14 about liens other than she says you have medical

15 bills, some of my medical bills, limited release.  I

16 don't see anything specifically as you couch it.  I

17 mean that last paragraph on page one, incurred costs,

18 how to make the check out.

19     Q      She doesn't, you know, provide any

20 assurances that any liens or other claims that might

21 exist will be taken care of by her -- would be taken

22 care of by her if they existed, does she?

23     A      Say that again, Peter.

24     Q      She doesn't state in the letter to the

25 extent if there were any liens or any other

1    third-party rights to any insurance proceeds how those

2    would be handled, does she?

3         A       Yeah, the letter speaks for itself.  She

4    doesn't specifically address that in there.

5         Q       Now, are you aware that at the time this

6    letter was sent that Mr. Werner had in his possession

7    documents and records responsive to Statewide's

8    April 30th, 2012, letter, Exhibit 10?

9         A       I don't know that that's accurate.  I

10   thought Mike addressed that in his testimony to you.

11   It seemed to be a little different than the way you

12   just couched it.

13        Q       Okay.  What in your mind should Statewide

14   have done when they received this demand?

15        A       They should --

16               MR. DOLDER:  And I'll just object.  That

17          is not a question we intend to ask him at

18          trial.  We're not offering him as an expert as

19          to what Statewide could have, should have,

20          would have done.

21               But go ahead and answer the question.

22        A       They should have responded we accept your

23   demand.

24   BY MR. SCHMIDT:

25        Q       Now, she offered a limited liability

1    release.  How would Statewide know what should or

2    should not be in there?

3         A         Well, certainly they -- limited liability

4    release is by statute.  I've done I would dare say

5    hundreds of limited liability release demands.  I've

6    never attached a limited liability release to a

7    demand.  They have a form I'm sure that they use, and

8    they may have a week later said would these terms be

9    acceptable to you, would these terms work, these terms

10   are what we commonly use, would you accept them.

11   That's typically the way we see it is to say -- rather

12   than, you know, reject it and impose new terms.

13        Q         But I guess what I'm asking is are you

14   saying that if they had sent a limited liability

15   release and not had any escrow language, then that

16   would have been acceptable?  I'm just not

17   understanding.

18        A         No, they could have asked.  They're

19   allowed to ask a question, would this be acceptable,

20   we accept your demand.

21        Q         Now, are we talking pre-statute or

22   post-statute?

23        A         Well, I kind of think both still.  Once

24   you accept the demand and you put it out there without

25   any conditions countering it, like they did in this

1   case, they would have said here's what we propose,

2   does this meet with your approval.  You're asking me

3   what they could have done, and Rich has qualified it.

4                Certainly that happens, they could have

5   done that.  Would this be acceptable.  If not, tell me

6   what is.  I've had this come up all the time.  I just

7   had it come up recently where I sent a limited

8   release.  They didn't put language in there the way I

9   wanted it.  I said we have no -- they asked me if this

10  would be acceptable.  I said no, my demand was clear,

11  don't put that term in there.

12               And so they certainly are allowed to send

13  a proposed release after they have accepted it.  In

14  this case we 100 percent know they rejected the

15  demand.  So of course I'm referring to the court of

16  appeals in the obvious face of it.  Does that answer

17  your question, how they could have handled the

18  release?

19      Q     Well, I guess understanding that --

20  strike that.

21               Ms. Kemper instructed in her letter,

22  wrote do not call; okay?  How was Statewide to deal

23  with that issue under those circumstances?

24               MR. DOLDER:  Objection.  It misstates the

25          evidence.  Go ahead.

1    BY MR. SCHMIDT:

2        Q        Whatever the language is in the letter.

3    It says do not call, I think, or -- I can't --

4        A        I understand what you're referring to.

5    I've got it right in front of me here.  Please do not

6    contact me or my friends, as this demand is very

7    simple.

8        Q        You'd agree that Mr. Chop couldn't call

9    her?

10        A        No, I don't agree with that.

11        Q        You think he could?

12        A        You can still call somebody.

13        Q        Okay.  Even though she's written that?

14        A        Yeah.  There was nothing prohibiting it.

15    There's not some legal directive that prohibits it.

16    There's nothing ethically, morally, or legally that

17    prohibited him from bringing her a bouquet of flowers

18    to the hospital and saying I know you didn't want me

19    to contact, if you want me to leave, tell me to leave.

20                But he could have done that.  So the

21    answer is -- this lady was laying in the hospital for

22    months and months and millions of dollars in medical

23    bills and you're really telling me that this guy can't

24    show up with a box of cookies or a bouquet of flowers

25    and say, ma'am, if you want me to leave, I will leave,

1    but ...

2              You know, the answer is -- so that's one

3    hypothetical of many.  She did say that.  I don't

4    blame her, but she did say don't contact me or my

5    friends, but ...

6        Q        I mean that's not the insurance company

7    saying, that's her.

8        A        She said it, no question.

9        Q        And you know that there are lawyers out

10   there that would see that and say and if you call, you

11   just blew the demand.

12       A        Potentially, I guess.

13       Q        It's a risk.

14       A        Perhaps.  But I don't, I don't, I don't

15   know if that's blowing it.  But the answer to your

16   question is he did contact her.  He sent her a letter

17   rejecting the demand.  So why didn't he just send a

18   letter -- what he could have done is your question, is

19   he could have said we accept your demand, a week later

20   saying ma'am, as you know, we accepted your demand,

21   here's a proposed release.

22              That's another hypothetical of what he

23   could have done if you're asking me.  Again, I know

24   I'm not being offered for these opinions, but what he

25   could have done.  Could he have contacted her?  He did

1    contact her.  He wrote a letter back.

2         Q       You're familiar with the WellStar

3    decision obviously.  You use as the reference at

4    least, folks have said dicta regarding escrow accounts

5    and the like.

6         A       Right.

7         Q       Are escrow accounts ever appropriate,

8    requesting an escrow account ever appropriate?

9         A       Well, that's an open-ended question.  I

10   think in this situation for this individual lay

11   person, no.  But, you know, I have had, or there could

12   be a situation where an insurance company would ask

13   you to hold, a lawyer to hold something in escrow, if

14   it was agreed upon previously that a lien would be

15   satisfied.  So ever appropriate?  You know, it's an

16   open-ended question, Peter.

17        Q       But whether or not it is appropriate or

18   not depends upon the specific circumstances that

19   exist; correct?

20        A       Totality of the circumstances, I think

21   the cases say yes.  I don't even know if an individual

22   like Ms. Kemper could open an escrow account.  I've

23   never seen that ever, ever, in a case for this.

24   That's not my area, but I've never seen that in ...

25        Q       Now, as far as the insurance company

1    goes, and understanding you're not here as an

2    insurance expert, but you recognize that whatever the

3    insurance company does, they owe an obligation to

4    protect its insured; correct?

5         A       Yeah, they have duties to their insured.

6    Is that the question?

7         Q       Yes.

8         A       For sure.

9         Q       But you're not providing any testimony

10   regarding what was done in this case, whether or not

11   it was done to protect Mr. Brown or not; correct?

12   You're not getting into that, that's not your area?

13        A       Well, I think we covered that earlier,

14   that they didn't do it enough to -- no one protected

15   Mr. Brown in this situation.  So that third opinion

16   there in my disclosure clearly addresses some of that,

17   but ...

18        Q       Well, does a hold harmless indemnity

19   protect Mr. Brown?

20        A       Not necessarily.

21        Q       But it could?

22        A       I don't know in this situation.

23        Q       Well, tell me about that.

24        A       Insisting on that does not protect

25   Mr. Brown because it rejected a very clear and

1    straightforward demand.

2         Q        Well, my question is is a hold harmless

3    and indemnity would protect, provide protection to

4    Mr. Brown, would it not?  I'm not asking regarding the

5    efficacy of it in light of the demand.  I'm saying I'm

6    looking at the protection of Mr. Brown only.

7         A        From personal exposure and an excess

8    judgment?

9         Q        Yes.

10        A        It could in the right situation provide

11   some level of protection, yeah.

12        Q        And making sure that liens to the extent

13   they exist are paid, that would also provide Mr. Brown

14   a level of protection, would it not?

15        A        Did not in this situation.

16        Q        I understand.  But it would in the

17   appropriate circumstances, would it not?

18        A        I'd need more facts for your

19   hypothetical, but you could probably fathom -- you

20   could probably fashion a hypothetical that would

21   provide some level of protection in the right

22   situation.

23        Q        How did Ms. Kemper satisfy her

24   responsibility to assure satisfaction of liens in this

25   case?

1        A        There were no liens.

2        Q        I understand that.  But how did she?

3        A        She had no liens.  I'm not sure I

4    understand your question.  That would be like saying

5    if you're not drinking, how do you ensure you're not

6    drinking and driving.  Well, I'm not drinking.  In

7    this case, how does she satisfy -- there's no liens.

8        Q        Okay, did she say there were no liens?

9        A        She doesn't have to say there are no

10   liens.

11       Q        She doesn't?

12       A        She doesn't have to say that in that

13   demand.

14       Q        Even if she knows of it?

15       A        She didn't have any.

16       Q        But I'm saying if she knew of them, would

17   she have to tell them?

18       A        If she had a valid hospital lien, she

19   may, a valid and enforceable lien, she may.  It

20   depends.  It depends.  Go ahead.

21       Q        What if she had assigned rights to

22   insurance proceeds to a medical provider?

23       A        She didn't in this case.  But if she did,

24   she may have a duty to do something with that.

25       Q        Why do you say she didn't in this case?

1     A          No evidence of it.  Well, when you say

2    assign rights, you're talking about assigning rights

3    to --

4          Q          Policy proceeds.

5          A          That's what I figured you were saying.

6    And the point of that is -- I probably should clarify

7    it a little bit.  She had no liens, she was aware of

8    no liens.  She had -- her plan was not a self-funded

9    ERISA plan.  There was no valid or enforceable lien at

10   the time of this demand.  She did nothing wrong with

11   it and handled it appropriately.

12         Q          How was Statewide to be able to find out

13   any of that information that you just said?  How were

14   they to find out about her ERISA plan, whether or not

15   she got a lien in the mail and it had not been yet

16   filed, I mean recorded of record?

17         A          Well, again, you're asking me to tell you

18   what insurance should do in their internal practices.

19   But what I've seen is they go to the hospital and

20   visit the person, they go to the employer and talk to

21   them.  Somehow Mike Werner impressively knew

22   immediately there was no valid lien, knew immediately

23   because of who her employer was, not self-funded ERISA

24   plan.  They were getting medical bills directly from

25   providers.  They had the option to go to the county

1    courthouse and see if a valid lien had been filed.

2              There's a lot of options insurance

3    companies have, and I see them in all my cases.  I see

4    Progressive doing it in this one example in this case,

5    is Progressive did more.  They went to the hospital.

6    They showed up.  They actually drove their car over to

7    the hospital.  Equity could have done that.  They

8    showed up to the hospital.  So you're asking me what

9    an insurance company could have done.  There's a lot

10   they could have done in this situation, none of which

11   I see that they did.

12        Q        And of which, none of which you are an

13   expert to opine on either; correct?

14        A        Well, that's a little different than --

15   Rich is not offering me for that, but I do feel like I

16   have some expertise in these areas because I deal with

17   it regularly.

18        Q        But what an insurance company is

19   obligated to do or not to do, as far as an expert,

20   you're not providing an opinion in that basis, are

21   you?

22        A        Apparently not in this case except to the

23   extent it touches on the three areas I've shown in my

24   disclosure of May 10th as relates to Werner's response

25   and what's common among reasonable plaintiffs' counsel

1   and, you know, the three opinions.

2              MR. DOLDER:  And again, Peter, my

3         objection will be that -- you know, you can ask

4         him what his opinions are of course, but to ask

5         him prospectively whether he will offer in

6         general a particular type of opinion is

7         difficult for him to respond to because he

8         hasn't been asked a question.

9              THE WITNESS:  Right.

10             MR. DOLDER:  He's just going to respond

11        to questions at trial, subject to Judge

12        Batten's instructions and rulings on their

13        scope.

14  BY MR. SCHMIDT:

15       Q      In your practice, as far as providing

16  assurance regarding the handling of liens, when

17  necessary, what do you do, what's your methodology to

18  provide a carrier assurance that liens are going to be

19  taken care of, what do you do?

20       A      Well, it depends.  On every release or

21  demand -- I shouldn't say demand.  It just depends on

22  the case.  When I'm dealing with liens, I do like to

23  wrap things up for my client to the extent, you know,

24  an option.  So in a situation like this, I would

25  pretty much do what Mike did, which they both

1   testified and said you're screwed, there's never going

2   to be enough money to cover all these medical bills,

3   you didn't have enough insurance, he didn't have

4   enough insurance, you're never going to be able to

5   pay.  If there was a situation like that -- it doesn't

6   apply here -- but let's say if there was a lien and

7   there was not enough insurance to cover a potential

8   lien.  Doesn't apply here.

9              That's a different scenario than if

10  there's a $4 million settlement and you have $400,000

11  in liens.  Now, not all those liens could technically

12  be required to be satisfied.  Medicare, Medicaid would

13  be ones you would want.  Hospital liens -- that's

14  okay, you broke my chair, I'll send you a bill.  No,

15  I'm kidding.

16             Hospital liens may be something

17  different.  So we write in our releases, if we're

18  negotiating a release, that we will handle any valid

19  and enforceable liens, which is an important

20  distinction because they're not all valid and they're

21  not all enforceable and they're not all have a right.

22  And so -- I can give you many examples of that.

23             So it just depends.  So I like to try to

24  wrap things up for my clients.  If there's excess

25  funds to adequately cover the loss, that's a different

1   analysis, and I'll say okay, well, Dr. Schmidt has a

2   bill that's not necessarily technically a perfected

3   lien or an enforceable lien, but Dr. Schmidt treated

4   you, so let's talk to Dr. Schmidt and stuff like that.

5   That could be a totally different scenario that

6   doesn't apply here.  So there's a lot of different

7   analysis.

8        Q       But as far as the language regarding

9   dealing with the liens in a release situation, one

10  option is to include language to say that you're going

11  to take care of legal and valid liens I think is what

12  you said.

13       A       That is negotiated in some cases --

14       Q       Okay.

15       A       -- and not in others.

16       Q       And what makes the distinction?

17       A       Could be any number of factors.  The

18  amount of available coverage.  For example, if I had

19  $25,000 and a million dollars in damages, I wouldn't

20  say I would satisfy any and all liens out of that

21  because it would not be possible and I don't think

22  that that would be even legal to agree to something

23  like that.  To have my client sign that would be

24  illegal, I mean that they're going to satisfy -- for

25  example, in this case, if you were trying to say well,

1    I'm going to -- everyone knows that couldn't happen.

2    She'd been in the hospital for three months, or two

3    and a half months.  You can't satisfy the liens out of

4    $25,000.  There's going to be an issue.

5            There were no liens, I should add.  But

6    as a hypothetical you're giving to me.  I mean it just

7    depends, Peter, there's just so many different ways

8    and there's so many different factors that you

9    consider as a plaintiffs' practice.  In this case I

10   think they handled it perfectly, Mike Werner did, Amy

11   did, and they were right.

12       Q    If there were no liens and the goal was

13   just for Ms. Kemper, as you say, to get the money and

14   go, then why didn't she just accept the money?  Why

15   was that wrong?

16       A    Well, you're getting into her --

17            MR. DOLDER:  Objection; speculation, lack

18       of foundation.

19   BY MR. SCHMIDT:

20       Q    You can go ahead and answer.

21       A    Well, you can glean it from the

22   testimony.  At that point she didn't just get the

23   money.  She got a counteroffer rejecting her demand

24   from Equity.  At that point -- she even says it was

25   her intention to take the money initially.  She

1   doesn't maybe say it that strongly, but she says well,

2   I didn't know, I thought they had paid it and it was

3   going to be over, and then I read what does my

4   mortgage have to do with this -- you know what I'm

5   talking about -- and Mike Warner said, mortgage?

6           And he started reading the counteroffer

7   that now has been through the court of appeals.  So

8   they didn't just give her the money.  They realized

9   that Equity had placed new conditions and rejected her

10  offer to settle.  And then at that point it's a

11  totally different analysis.  Everything that happens

12  before that is out the door.

13      Q       Well, you stated it, that at that time

14  Ms. Kemper, when she received the monies, she knew

15  there were no liens; right?

16      A       She was unaware of any liens.

17      Q       And if she was unaware of any liens,

18  there would be no reason for an escrow account, would

19  there be?

20      A       There would never be a reason in this

21  situation for her to open an escrow account.

22      Q       Okay.  So there would be no --

23      A       If she could even do it.  Again, I'm -- I

24  don't even know that she could do it.  I don't think

25  she could do it, but -- however she would do that as

1    they say in that letter.  But go ahead.  So you're
2    saying they imposed an irrelevant and nonsensical
3    condition on her?
4        Q      I'm just saying in actuality, she was the
5    person in the best position to know whether there was
6    a lien or not, and knowing there were no liens, there
7    were no restrictions on the money.
8        A      That's not true.  There was an absolute
9    restriction on the money in many ways, one of which
10   was open an escrow account and take care of liens,
11   pending liens, which is a whole, another whole issue
12   of problems as a counteroffer.
13       Q      Again --
14       A      But there were tons of conditions on it,
15   to answer your question.  So I don't agree with your
16   question.
17       Q      But my question was focusing on she knew
18   there were no liens, we've agreed to that, correct,
19   when she received the check?
20           MR. DOLDER:  Objection; it misstates the
21       evidence.
22       A      Right.  I think I just answered that.
23   She was -- I said she was unaware of any liens.  And
24   Mike Werner testified that there was no valid
25   enforceable liens at the time effectively.

1   BY MR. SCHMIDT:

2        Q        At the time what?  I'm sorry?

3        A        At the time of the demand.

4        Q        Okay.  But he did not know that at the

5   time he sent the demand for her, did he?

6        A        He did pretty much know it.  He testifies

7   pretty clearly.  I have looked at that, saying he knew

8   it.  He knew it was not a self-funded ERISA plan, her

9   working for the Coweta County Sheriff's Department.

10  He knew there were no liens.  He told you that

11  unequivocally in his deposition.  There would be no

12  valid enforceable liens, I should add.  But we can go

13  to the testimony if you want, to be exact.

14       Q        No, I, I --

15       A        Yeah.

16       Q        -- I trust it.  Let's go to your report.

17       A        Sure.

18       Q        Let's start at page two there.

19       A        Okay.

20       Q        And I sort of want to work through this.

21  Dealing with first Mike Werner's actions, or Michael

22  Werner's actions, it says Michael Werner's actions in

23  dealing with Ms. Kemper were, and then you give four

24  examples of actions, I'm assuming.  Are there more?

25  Have you listed anymore actions that you're claiming?

1      A        Well, I don't know that I identify

2  specific actions broken down per se like that.  Like

3  with number one, they were consistent with the custom

4  and practice of a plaintiff attorney in the Atlanta

5  metro area, that's not related to listing out actions,

6  that's saying --

7      Q        No, I'm simply --

8      A        I've read the totality of his deposition,

9  and his actions were -- all of the actions he did I

10 think were very consistent.

11             Now, if we go through his deposition,

12 could we identify actions he took that I thought were

13 reasonable?  Absolutely.  I mean he did -- I'm proud

14 of Mike.  He did a good job.  He did a -- he tried to

15 help --

16     Q        But you do not have the actions listed

17 out other than these four in the report; correct?

18     A        Well, I think I do throughout the report.

19 But -- there's a lot of them.  But yes, you could go

20 line by line in his, what he testified to how he

21 handled it and why in response to your questions and

22 you could say yeah, that was reasonable, that was

23 reasonable, that was reasonable.

24             But, you know, in conformance with the

25 standard of care required of an attorney who undertook

1   to advise Amy Kemper, you said I listed out four

2   actions.  I don't know that that's necessarily --

3   that's describing the standard of care in that he,

4   what he did definitely follow it.

5           Reasonable considering the facts and

6   circumstances of this case; and an example of ethical

7   and professional legal service to a person who needed

8   it most.  That's good.  Mike did a very good job.  As

9   I listed, examples.

10      Q       Would it have been reasonable for

11  Mr. Werner to tell Ms. Kemper to just call the

12  insurance company and ask about the escrow account,

13  the need for an escrow account?

14      A       No.

15      Q       That's not reasonable?

16      A       No.

17      Q       Why?

18      A       Lot of reasons.  One, she expressed a

19  very clear opinion that she was concerned about

20  dealing with the insurance company, one, because they

21  have a bad reputation.  They tend to manipulate

22  people, which she may have been right in hindsight, or

23  well-founded in her considerance.

24          She was angry.  She knows that she was

25  going to spend the rest of her life with pain and

1    suffering and didn't want to talk to the insurance

2    company or -- and she distinguished that in her

3    deposition very clearly repeatedly.

4              So then another thing is they had

5    reejected her demand.  They made a counteroffer.  They

6    rejected it.  So to answer your question, would it

7    have been reasonable for Mike Werner to tell her to

8    call and just say -- no, they had rejected it.  It's a

9    whole different analysis.  He appropriately spotted

10   that they decided to put themselves in this position.

11             Mike didn't do anything.  She didn't do

12   anything to cause them to be in this position.  They

13   made that decision to reject her demand.  And at that

14   time Mike has a set of duties, even if he's not

15   legally has a contract with her to advise her of her

16   rights.  And at this point you start saying there's

17   this thing called bad faith, and you have this option

18   to consider.  And so no, I don't think it would have

19   been reasonable for him to just say, oh, call them and

20   talk to escrow, no, no way.

21        Q    Why didn't he call and ask about the

22   escrow account?

23        A    Why would he?

24        Q    You would never have done that?

25        A    Why would he?  No.  Why would he do that?

1      Q       You don't think that's a reasonable
2  option?
3      A       No.
4      Q       If your client is looking to get $25,000
5  and they have a check of $25,000 and the only issue is
6  relative to liens?
7      A       No.  At this point, that's not the only
8  issue.  At this point they've rejected her demand and
9  now she has a whole different set of considerations.
10     Q       And what are --
11     A       As reflected in the reported decision by
12  the court of appeals.  They rejected her demand.
13  Obviously that was later on.  But Mike spotted exactly
14  what the court of appeals said.  It was a clear
15  rejection of her demand.  And at that point, whether
16  he's her lawyer or not, if he's advising her, he must
17  tell her her rights.
18     Q       When someone is making a demand, is it
19  reasonable to assume they're wanting to settle the
20  case?
21     A       I wouldn't say want to.  There's a
22  difference between wanting to and being stuck with
23  incredibly low limits.  So you may not want to settle
24  it.  You know, you've got a million dollars in medical
25  bills, you really don't want to settle.  You know, so

1    it's a qualified want to.  I mean she probably would

2    have wished there was more insurance when she offered

3    to settle.  She definitely offered to settle, whether

4    you qualify it as want to or not.  She probably didn't

5    want to.  She probably wanted to continue the fight.

6    I don't know the answer to that.  You didn't ask that

7    question.

8              She clearly offered to settle.  Whether

9    you would qualify that as a want to or not, I don't

10   know.  And there's a difference -- one thing, I want

11   to qualify that.  There's a difference for her reasons

12   for doing the demand, which were legitimate, as

13   opposed to wanting to.

14        Q    I'm sorry I didn't understand, you tailed

15   off there.

16        A    Well, she told you in her deposition the

17   reasons why she made the demand as opposed to, you

18   know, you used the word want to.  I have a problem

19   with that, but I'm probably overanalyzing the word

20   want to.

21        Q    Now, at the bottom of page two, starting

22   there where it says the basis and reason for my

23   opinions --

24        A    Sure.

25        Q    -- and then you say which incorporate

78

1    other opinions, I don't understand what you're saying

2    there.  Can you explain that, what you're saying

3    there?

4         A         Which incorporate other opinions.  Yes,

5    some of these opinions have overlapping subject

6    matters.  The basic reason for my opinions is to

7    incorporate other opinions.  You know, there's -- and

8    there's, you know, sub elements.  You can never in an

9    opinion, you're not required to, it's clear from the

10   federal rules, list every single thing.  It's not like

11   I have to summarize all of these hundreds of pages of

12   depositions I was provided.

13        Q         But I don't understand what incorporating

14   other opinions, I don't understand what you're

15   incorporating is what I'm saying.  What are you

16   incorporating?  What does that mean?

17        A         Well, exactly like what's up above it.

18   I'm saying in this section the basic reason for my

19   opinions, which all three of these opinions kind of go

20   together.  You really just can't separate them out.

21   Like the rejection of the demand and Mike's response

22   to that kind of does dovetail a little bit into the

23   fact that no one was looking out for Brown, which was

24   opinion three, and what would have happened had Brown

25   been involved in it, you know.  So it's supposed to

1   mean ...

2               MR. SCHMIDT:  All right, that's all I've

3        got, guys.

4               MR. DOLDER:  Mr. Law, would you like to

5        read and sign?

6               THE WITNESS:  Sure.  And if I don't, I've

7        waived.  If I don't get it to you in 30 days,

8        I've waived.

9                   (Deposition concluded at 1:09 p.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          **E R R A T A   S H E E T**

2          I, the undersigned, PETER A. LAW, do hereby

3      certify that I have read the foregoing deposition and

4      that, to the best of my knowledge, said deposition is

5      true and accurate (with the exception of the following

6      corrections listed below.)

7      PAGE/LINE          CORRECTION (and reason for correction)

8      _____/_____

9      _____/_____

10     _____/_____

11     _____/_____

12     _____/_____

13     _____/_____

14     _____/_____

15     _____/_____

16     _____/_____

17     _____/_____

18     _____/_____

19     _____/_____

20     _____/_____

21

22                                  _____
                                     Signature

23     _____
       Notary Public

24     Date_____

25     My Commission Expires:_____

81

1                   C E R T I F I C A T E

2   STATE OF GEORGIA:

3   COUNTY OF GWINNETT:

4

5        I hereby certify that the foregoing proceedings
    were reported as stated in the caption and the
6   questions and answers thereto were reduced to
    writing by me; that the foregoing 79 pages
7   represent a true and complete transcript of the
    evidence given on July 8, 2017, by the witness,
8   PETER A. LAW, who was first duly sworn by me.

9        I certify that I am not disqualified for a
    relationship of interest under O.C.G.A. 9-11-28(c);
10  I am a Georgia Certified Court Reporter here as an
    independent contractor of Q&A REPORTING SERVICES,
11  INC.; I was contacted by Q&A REPORTING SERVICES,
    INC., to provide court reporting services for this
12  proceeding; I will not be taking this proceeding
    under any contract that is prohibited by O.C.G.A.
13  15-14-37(a) and (b) or Article 7.C of the Rules
    and Regulations of the Board; and by the attached
14  disclosure form I confirm that Q&A REPORTING
    SERVICES, INC., is not a party to a contract
15  prohibited by O.C.G.A. 15-14-37 or Article 7.C of
    the Rules and Regulations of the Board.

16

        This, the 11th day of July 2017.
17

18

19

20

21       _____
         LYNN VAN RY, RPR
22       CCR No. B-1120

23

24

25

82

                COURT REPORTER DISCLOSURE STATEMENT
           STATE OF GEORGIA  //  COUNTY OF GWINNETT
                   DEPOSITION OF PETER A. LAW


        I, LYNN VAN RY, Certified Court Reporter, do
hereby disclose pursuant to Article 10.B of the
Rules and Regulations of the Board of Court
Reporting of the Judicial Council of Georgia that
I am a Georgia Certified Court Reporter; I was
contacted by Q&A REPORTING SERVICES, INC., to
provide court reporting services for this
proceeding; I will not be taking this deposition
under any contract that is prohibited by O.C.G.A.
15-14-37(a) and (b) or Article 7.C of the Rules
and Regulations of the Board; and I am not
disqualified for a relationship of interest under
O.C.G.A. 9-11-28(c).

        There is no contract to provide reporting
services between myself or any person whom I have
a principal and agency relationship nor any
attorney at law in this action, party to this
action, party having a financial interest in this
action, or agent for an attorney at law in this
action, party to this action, or party having a
financial interest in this action.  Any and all
financial arrangements beyond my usual and
customary rates have been disclosed and offered to
all parties.

        This, the 11th day of July 2017.




                        _____
                        LYNN VAN RY, RPR
                        CCR No. B-1120