IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

AMY MARIE KEMPER, as assignee    )
of CHRISTOPHER L. BROWN,         )
                                 )
            Plaintiff,           )    CIVIL ACTION FILE
                                 )    NO. 1:15-cv-2961-TCB
      vs.                        )
                                 )
EQUITY INSURANCE COMPANY,        )         VOLUME II
                                 )
            Defendant.           )


        Continuation of the deposition of

    PETER A. LAW, taken on behalf of the Defendant,

    pursuant to the stipulations contained herein,

    before Lynn Van Ry, RPR, CCR No. B-1120, at 563

    Spring Street, Atlanta, Georgia, on November 3,

    2017, commencing at the hour of 11:27 a.m.

            Q&A REPORTING SERVICES, INC.
             Certified Court Reporters
        2221 Peachtree Road, NE, Suite D-517
              Atlanta, GA  30309-1148
    404.233.3300    **   Admin@QAReporting.com

84

1   APPEARANCES OF COUNSEL

2        ON BEHALF OF THE PLAINTIFF:

3            RICHARD E. DOLDER, ESQ.
             Slappey & Sadd, LLC
4            352 Sandy Springs Circle
             Atlanta, GA  30328
5            404.255.6677
             rich@lawyersatlanta.com
6

7        ON BEHALF OF THE DEFENDANT:

8            PETER H. SCHMIDT, II, ESQ.
             Taylor, Odachowski, Schmidt & Crossland, LLC
9            300 Oak Street
             Suite 200
10           St. Simons Island, GA  31522
             912.634.0955
11           pschmidt@tosclaw.com

12

13

14                    - - -

15

16

17

18

19

20

21

22

23

24

25

85

1                    INDEX TO EXAMINATION

2  By Mr. Schmidt . . . . . . . . . . . . . . . . Pg  87

3

4

5                     INDEX TO EXHIBITS

6    EXHIBIT            DESCRIPTION              PAGE

7     *160        Peter Law's Expert Report        133

8     *168        Aug. 9, 2012 E-mail from Allred   92
                  to Whiteley
9
      174         Aug. 10, 2012 E-mail from Allred  88
10                to Cooper

11    175         May 7, 2012 Allred's PowerPoint   89
                  presentation
12
      176         Oct. 10, 2017 Pete Law's          90
13                Supplemental Expert Report

14

15

16    *Denotes previously marked exhibit

17

18    (All exhibits retained by counsel.)

19

20

21

22

23

24

25

1

2

3          (THE FOLLOWING TRANSCRIPT CONTAINS QUOTED
           MATERIAL; SUCH MATERIAL IS REPRODUCED AS
4          READ OR SPOKEN.)

5

6                              - - -

7

8          (IN THE FOLLOWING TRANSCRIPT, A DASH [ -- ]
           IS USED TO INDICATE AN UNINTENTIONAL OR
9          PURPOSEFUL INTERRUPTION OF A SENTENCE; AN
           ELLIPSIS [...] IS USED TO INDICATE HALTING
10         SPEECH OR AN UNFINISHED SENTENCE IN DIALOGUE,
           OR AN OMISSION OF WORD(S) WHEN READING WRITTEN
11         MATERIAL.)

12

13                             - - -

14

15

16

17         (Thereupon, the court reporter disclosed that
       she was there on behalf of Q & A Reporting
18     Services, Inc. in compliance with Article 10.B of
       the Rules and Regulations of the Board of Court
19     Reporting of the Judicial Council of Georgia and
       O.C.G.A. 15-14-37(a) and (b), the court reporter
20     discloses that she was retained by PETER H.
       SCHMIDT, II, to take down the proceedings.  Q & A
21     Reporting Services, Inc., will charge the
       attorney(s) the usual and customary rate for the
22     transcript and will be paid by the attorney(s) upon
       his/her(their) receipt of the transcript.)

23

24                             - - -

25

```
1                    PETER A. LAW,
2      having been first duly sworn, was examined and
3                  testified as follows:
4              MR. SCHMIDT:  This will be the
5      continuation deposition of Pete Law in the case
6      of Amy Marie Kemper, assignee of Christopher
7      Brown versus Equity Insurance Company.
8              We'll have the same stipulations we've
9      had for every deposition in this case.  I take
10     it that's acceptable.  I'm sure Pete recalls
11     the Court's order regarding if you have any
12     questions, focus them to me regarding any of my
13     questions and things of that nature.
14             THE WITNESS:  Sure.
15             MR. SCHMIDT:  There's also the standing
16     order.  Really, unless it's attorney-client
17     protected or work product protected, no
18     objections are permitted on the record absent
19     any of those items.  But if anything comes up,
20     we'll go from there.
21             MR. DOLDER:  And I think objections are
22     allowed.  What is not allowed is instructions
23     not to answer the witness (sic) unless it's
24     pertaining to --
25             MR. SCHMIDT:  I'm not sure about that,
```

1            but in any event, we'll go on.

2                    CONTINUED EXAMINATION

3    BY MR. SCHMIDT:

4        Q      All right, Pete, we had taken your

5    deposition a while ago in this case, and then there's

6    been some supplemental opinions -- or I don't even

7    know if you want to call them supplemental opinions,

8    but just some additional information that you've

9    reviewed.  And based upon that, you've issued a

10   report, October 10th, 2017, report.

11               What I want to do first before we get

12   into it is understand specifically what you reviewed

13   in preparing your October 10, 2017, report.  And I

14   believe we've culled at least a part of it out here,

15   and one of them is an August 9, 2012, e-mail from Bill

16   Allred to Tabatha Whitely; is that correct?

17       A      Let's see what page.

18       Q      And I did, just so the record is clear, I

19   took off the --

20       A      Right.

21       Q      I didn't have that on there.

22       A      I have that exhibit.

23                   (Marked for identification purposes,

24                    Defendant's Exhibit No. 174.)

25   BY MR. SCHMIDT:

89

1          Q       Okay, great.  And then the next item I

2     had was August 10, 2012, e-mail exchange by Mike

3     Cooper to Bill Allred.  There's other copies on it as

4     well.  But that I have marked -- or it was marked --

5     no, this is a new one, 174.  And just for the record,

6     so it's clear, it's Bates ST2957, 2958, and 2959.

7     Does that comport with what you've got?

8          A       Yes.

9                       (Marked for identification purposes,

10                       Defendant's Exhibit No. 175.)

11    BY MR. SCHMIDT:

12         Q       And then the last item, if I understood

13    correctly, we're going to mark it as Exhibit 175.  And

14    that is a printing of a PowerPoint presentation dated

15    May 7th, 2012; is that correct?

16         A       Right, pages 337 through 398.

17         Q       Great, I appreciate you doing that.

18    General question, Pete.  Other than those items, have

19    you looked at any additional items, new materials, in

20    preparing your October 10, 2017, report?

21         A       I don't think so.

22         Q       Okay.  And if you do remember something

23    while we're going, just let us know; okay?

24         A       Yeah.  I don't think so.  It was e-mailed

25    to me and I think wasn't ...

1       Q       Okay.  And then I'm going to mark what
2   we're going to have as Exhibit 176 to be your report.
3   Is that fair?
4       A       That would be fair.
5                       (Marked for identification purposes,
6                        Defendant's Exhibit No. 176.)
7   BY MR. SCHMIDT:
8       Q       Now, I just want to be clear as we go
9   through this, is you're not offering yourself as an
10  insurance expert, correct, an insurance industry
11  expert; correct?
12      A       I think that's correct.  As we discussed
13  in the first deposition --
14      Q       Okay.
15      A       -- I think we qualified that, you know, a
16  lot of these things touch on things that we,
17  plaintiffs' lawyers, do in the reasonable course of
18  business in dealing with insurance adjusters.  But
19  yeah, I think that's right.
20      Q       And just sort of moving on from there,
21  would you -- you'll agree with me that just because a
22  claim is not settled where there's a time limit
23  demand, that does not mean in and of itself an insurer
24  acted in bad faith, does it?
25      A       Say that one more time again.

91

1        Q        Yeah, you'd agree with me that just

2    because a claim is not settled, even where there's a

3    time limit demand involved, that alone doesn't mean

4    that the insurer acted in bad faith?

5        A        In a general broad sense, is it

6    automatic?  No, it's not automatic bad faith.  It's

7    case specific.

8        Q        Now, as far as touching on Allred a

9    little bit here, based on what you've seen -- well,

10    you know what, let's sort of rewind here, it may make

11    it easier here.

12              Do you know as of when -- I'll say as of

13    June 4 -- or June 5th of 2012, when Bill Allred -- or

14    rather, pardon me, when Ms. Kemper's demand was

15    responded to, what was contained in William Allred's

16    file?  Do you know what the content of his file was?

17              MR. DOLDER:  Objection, compound.

18        A        Well, I don't know that I've -- all I

19    have from Bill Allred's file were these two exhibits

20    you've marked, so if that answers your question.

21    BY MR. SCHMIDT:

22        Q        Okay.

23        A        And if this was in the file or not -- I

24    haven't actually seen Bill's file.  I would imagine

25    there would be more stuff in there, but I don't know

1  if there is.

2      Q       And just to clean it up, I mean other

3  than the document you have in front of you, you don't

4  know what else was contained in Bill Allred's file; is

5  that correct?

6      A       Right.  I haven't seen anything else that

7  he had in his file.

8      Q       Now, as far as Statewide's file goes,

9  you've seen portions at least of it; correct?

10     A       Sure.

11     Q       Okay.  Have you seen in reviewing

12 Statewide's file any communications, I guess written

13 communications, consistent with what is stated in

14 Exhibits 168 and 174?

15     A       Now, Peter, I've got to apologize.  I was

16 under the impression you were going to ask me about

17 these exhibits.  I didn't go back and review that

18 file.  If you recall during the first deposition, I

19 knew the record perfectly.  So I would need to review

20 this massive volume of stuff.  I was told that that

21 wasn't what we were doing today.

22             So I haven't gone back to reread State

23 Farm's (sic) file to see if -- you're saying the

24 information Bill gave them was also contained in that

25 file?

1      Q       Correct.

2      A       At the moment I can't answer that

3  question, but I would be happy to go back and do it

4  for you, because I haven't gone back to read the

5  voluminous file that I testified about previously.

6      Q       Okay.  All right.  Let's put that

7  question on hold for the moment --

8      A       Sure.

9      Q       -- and we'll come back to that.

10     A       Sure.

11     Q       Now, you agree with -- you would agree

12  with Bill Allred that the law at the time as far as

13  time limit demands was confusing, would you not?

14     A       No, not as it relates to this case.

15     Q       Okay.  But I'm talking about generally

16  here, not about this case, generally the law was

17  confusing as far as time limit demands?

18     A       I don't -- I didn't find it particularly

19  confusing in a day-to-day use of using it.

20     Q       Okay.

21     A       What part are you talking about?  I mean

22  there's a lot of single-spaced things.  What part is

23  confusing?  I see where he says, you know -- well,

24  anyway.

25     Q       Would you agree with me, at least, Bill

94

1    Allred thought time limit demand law was confusing at

2    this time?

3                MR. DOLDER:  Objection, foundation, lack

4         of knowledge.

5         A       Not really as it relates to this case.  I

6    mean I can't really -- tell me which part where you're

7    saying that Bill thought it was confusing.  I know he

8    says, you know, the Supreme Court hasn't spoken to

9    this in the current state of law.  I see on 2958 he

10   says that.

11   BY MR. SCHMIDT:

12        Q       Okay, well, let's sort of go on that.

13   Would you agree with me then at least that the law was

14   in flux?  How would you -- or maybe -- how would you

15   describe it?

16        A       What part of law is in flux?

17        Q       The time limit demand issues.

18        A       I'm not sure -- I'm not understanding.

19   What, like --

20        Q       Sure.

21        A       It puts -- you're talking about his last

22   paragraph of page 2958?

23        Q       Well, I'm not even talking -- 2958?

24        A       2958, over here.

25        Q       Oh, okay, I'm sorry.

1     A        That's all right.  Are you talking about

2  that I know the current state of the law, is that what

3  you're referring to?

4     Q        Actually, I was not, but I mean we can

5  look at that.

6     A        Well, then just tell me which part you're

7  talking about.

8     Q        Well, I'm trying to use -- get you to

9  tell me how you would describe Bill Allred looked at

10  the law from reading his materials.

11     A        I think Bill Allred was unequivocal that

12  you guys should have paid the demand, you didn't pay

13  the demand, and you created extra-contractual exposure

14  in what he said was 1.5 to $3 million range, which I

15  thought was low, but that's not really important, they

16  both -- Equity's own lawyer later said it was

17  10 million as opposed to 3 million.

18            But he knew it was a significant excess

19  problem that in Bill's words, basically Equity or

20  Statewide exclusively created by rejecting the offer.

21  So I didn't think there was anything confusing about

22  Bill as it relates to this case in the law.  He was

23  unequivocal that y'all rejected it and that now Werner

24  had a different set of facts on his hands.

25     Q        Yeah, that really wasn't my question --

1        A        Okay, sorry.

2        Q        -- so I'd move to strike that, your

3    answer.  But my question was relative to Bill's

4    interpretation of the Georgia law, not to this -- on

5    time limit demands, not necessarily to this case, but

6    generally.

7        A        Bill didn't understand time limit

8    demands?

9        Q        I'm not saying that.  What's your

10    interpretation of -- you said you read these e-mails

11    --

12        A        I did.

13        Q        -- Exhibits 168 and 174.  And all I'm

14    asking is what is your interpretation of what Bill

15    Allred was stating the state of the law was with

16    respect to time limit demands?

17        A        Well, Bill says it doesn't relate to this

18    Kemper case, but here's what if you had had a

19    different case, there could be some confusion over the

20    safe harbor in the Wellstar case.  But he kind of goes

21    on to say that's not applicable here.

22              So his impression was under some

23    different factual pattern -- you know, I read that

24    more as in future cases where you don't have this

25    problem you've created -- insurance company -- here's

1    how you can do a better job in handling this stuff.

2              And he said that some insurers, that the

3    current state of the law puts insurers in precarious

4    situations.  And, you know, there's not really much

5    interpretation for me to comment on Bill.  He's a very

6    highly qualified lawyer --

7         Q      Sure.

8         A      -- who I know well, and he does an

9    excellent job and would be qualified to give opinions

10   on --

11        Q      Yeah, my --

12              MR. DOLDER:  I'm sorry, Mr. Law, were you

13        done with your answer?

14        A      Well, you know, on how he interpreted the

15   law, it kind of says on the face exactly what his

16   e-mail says on how he interpreted it.  I don't know

17   that I necessarily agree with it, but you're not

18   asking whether I agree or disagree with it.

19              He's just giving an after-the-fact

20   history of -- you know, seems like it has a little bit

21   of CYA in there, Peter.  It seems like it has a little

22   bit of, you know, everything in it.  But he clearly

23   says it doesn't really apply to the Kemper case.

24              I'm not sure I'm understanding your

25   question.  Was Bill confused?  Not really as it

1  relates to this case, but maybe he's setting forth

2  hypotheticals of what-ifs and 98 times out of 100.

3  You know, he was projecting a little bit of what he

4  would have liked to have done.

5       Q      But if I understood some of your

6  testimony correctly, at least with respect to

7  Wellstar -- and understanding that you don't think

8  it's applicable in this case and others don't think it

9  is applicable as well -- you would agree that at least

10  on Wellstar, as a general proposition, Bill said the

11  law is confusing in that area?

12       A      I don't necessarily know that I said

13  that.  I think Bill says here's the scenario in which

14  you could have handled it to deal with Wellstar.  And

15  he said, you know, some insurers are confused over it.

16  I see he says he's in a precarious situation, so I'm

17  not discounting that.  But he says basically you do a

18  -- you accept a demand and then you call and you do

19  the what-ifs.

20       Q      And you'd agree that in order for a

21  lawyer to give an opinion, they need to know all the

22  facts and circumstances that exist with what an

23  insurance company knows at the time they receive a

24  time limit demand?

25       A      I don't know that I agree with that

1   either.  I think they need a sufficient quantum of

2   evidence on whether or not to accept the demand.

3        Q       Okay.  So do you know what was contained

4   in Statewide's -- or rather, from Statewide's file in

5   Bill Allred's file?  And I think we've already sort

6   of --

7        A       Yeah.

8        Q       -- hashed that.  And sitting here right

9   now, you don't know, just because your understanding

10  was that we weren't going to be getting into that, so

11  to speak?

12              MR. DOLDER:  Objection, compound.

13       A       Well, I think -- no, not because we

14  weren't going to get into it.  It's because all I see

15  of Bill Allred is what was given to me.

16  BY MR. SCHMIDT:

17       Q       Okay.

18       A       And so Bill certainly had the sufficient

19  amount of evidence to know that the demand should have

20  been accepted and wasn't accepted by Equity or

21  Statewide.  And so ...

22       Q       But that --

23       A       But beyond that, I don't know what else

24  Bill had in his file, what they discussed, what they

25  had.  I've got what the two exhibits you gave me were.

1       Q       Okay.  Yeah, and that's the reason I'm

2   asking, is that sitting here right now, you don't know

3   what Bill had in his file in order to come to the

4   conclusions he did that he at least after the fact

5   details in Exhibits 168 and 174; correct?

6       A       Well, he lists a lot of it in the two

7   documents, so I do know some of what he had in his

8   information he had.  I know he had enough information

9   to form an opinion.

10      Q       Okay, and what information then did he

11  have based upon what you've reviewed?

12      A       So you want me to go through the --

13      Q       Yeah, I just want to know what it is that

14  you believe he had in order to come to the conclusion.

15      A       Well, he says prior to June 5 -- let's go

16  the first sentence.  First he says I've pasted below

17  the last communication from Dave to me regarding this

18  matter.  Does that imply that there's other

19  communications?  So I don't know.  But he has the

20  information.  Prior to June 5, he and I discussed Amy

21  Kemper's demand.

22      Q       Yeah, let me stop you -- and it's not

23  meaning to cut you off, honestly.

24      A       Okay.

25      Q       But -- I mean we can read the e-mails.

1    But what I'm talking about is actual substantive

2    evidence, whether it is a demand letter, whether it is

3    a medical bill, things of that nature.  I'm talking

4    about the actual substantive evidence that he might

5    have had in his file.

6        A        Well, I was trying to answer that, and I

7    know you -- I guess you don't want me to answer that.

8    But like you go through his e-mails line by line.  For

9    example, he obviously had proof that there was no

10   lien.  We know that.  He did that.  He says he did

11   that.  I don't have that.  So he had that evidence in

12   his file, I would assume.

13       Q        Okay.

14       A        But it's in there.  And so if I go

15   through the letter -- the four -- six pages of

16   single-spaced e-mails, I could point to you what he

17   had in his file because he states it in his e-mail.

18   But all I know that he -- the only physical documents

19   I've seen from his file are these two exhibits.  But I

20   know that Bill had information necessary to give the

21   opinions he was giving.

22       Q        Even though you've not seen those items?

23       A        Right, because he references a lot of it

24   and he forms opinions.

25       Q        Okay, let's take a break just because I

1   don't want to spend time, you know, regurgitating the

2   e-mails in their entirety since they're part of the

3   records, but I want you to do a list of what you think

4   he had information on at the time he was giving his

5   advice based on these two e-mails.

6              MR. DOLDER:  And you're limiting your

7        question -- just so that I understand the

8        question, because when you keep asking it, the

9        record won't reflect that you keep touching

10       Exhibits 168 and 174.

11             MR. SCHMIDT:  That's correct.

12             MR. DOLDER:  And so in line with

13       Mr. Law's previous deposition testimony that he

14       had not gone back and looked at everything in

15       the original file for his supplemental report,

16       you're limiting it to those two exhibits?

17             MR. SCHMIDT:  Correct.

18             MR. DOLDER:  Okay.

19             MR. SCHMIDT:  We can go off the record

20       and then just maybe make a list of it, and then

21       we can go back on just to -- rather than going

22       back and forth.

23       A     Well, rather than go off the record, can

24   I, as I go through it -- you've asked me to read all

25   these pages --

1  BY MR. SCHMIDT:

2      Q      Sure, I'm fine with that, too.

3      A      All right, so obviously had --

4              MR. DOLDER:  Are we on the record, or

5          not?

6              COURT REPORTER:  Yes.

7      A      Okay, I will tell you that there's been

8  discussions.  And so you didn't ask whether it was

9  documentary or whether maybe David Chop or Tabitha or

10 somebody provided them information.  So we know that

11 there's evidence or some information given to Bill

12 regarding Ms. Kemper's medical bills, regarding the

13 fact that she's a state employee and the implications

14 of that, the lien issue we discussed.  We had the

15 evidence regarding different lien information.

16             He asked questions about her group health

17 insurer.  He talks about -- and I'll also add,

18 obviously I think this PowerPoint presentation

19 predates this, so he had that because he gave it, his

20 presentation.

21 BY MR. SCHMIDT:

22     Q      Well, that's not my -- I'm focusing on

23 Exhibits 168 --

24     A      Yes, sure, I'm just going through it.

25     Q      -- and 174 regarding the Kemper claim.

1    A        Well, is this part of the Kemper claim --

2    Q        No.

3    A        -- or not?  I mean he presented it to

4    them.

5    Q        I understand that, but it's not part of

6    the Kemper claim.

7    A        Okay.  He talks about several demands

8    where there were liens.  So presumably at this point

9    he had been given information regarding that.  Case

10   law, he talks a lot about case law.  And he talks

11   about this other bad faith claim -- or exposure, I

12   guess, Statewide is also facing in the Baldwin v.

13   Pinkard claim with Tiffany.

14            He references in this claim -- I don't

15   know if he keeps -- how Bill keeps his claims, but

16   that's obviously something that he had information on,

17   whether written or oral.  And going through Bill's

18   e-mail, if you don't accept a demand, you are exposed

19   to unlimited liability on the entire claim.

20   Q        Yeah, I'm focusing on --

21   A        The demand, so -- the demand, obviously

22   he's giving opinions on demand.  So you're asking me

23   to assume what's in Bill's file; right?

24   Q        Yes.  And I'm talking about substantive

25   physical documents and records.

1     A       Okay.  He covered the Wellstar case with
2  Dave.  And he covered the court of appeals opinion, an
3  opinion.  Okay, so he had a vendor.  He hired a vendor
4  to find out about the liens.  The vendor advised there
5  were no liens.  So he had that in his file, whether it
6  was, you know, if he signed a contract or if he got
7  the lien.  A lot of times they'll send the results of
8  the liens.  So he likely had something in regard to
9  that, whether it was a memo, oral, or actually the
10 company providing certification, that would be in his
11 file.
12          See, I guess you're asking me
13 hypotheticals, what possibly could be in the file.
14 Like he advised Dave he should accept the Kemper
15 demand.  And he was happy to draft a limited liability
16 release for him and to get it to Kemper.  So I don't
17 know if he put that in writing or not.  Maybe there's
18 a letter to him in his file, I don't know.
19          But obviously he had that conversation.
20 I don't think that's in dispute per his e-mail below.
21 He had an e-mail, the e-mail below.  He did not have a
22 letter.  He did not see the letter rejecting
23 Ms. Kemper's demand.
24          Okay.  He basically says I guess in that
25 next paragraph how Statewide -- how there were

1    obviously no liens and that Statewide, even if there

2    were, didn't handle it correctly.

3         Q       Yeah, I'm not -- I mean, Pete, I know

4    what you're trying to do is go through this, but I'm

5    not looking for commentary.  I'm just looking for the

6    items, and that's the reason I was suggesting --

7         A       Well, you're asking me to guess what he

8    had in his file.

9         Q       I'm saying based upon --

10        A       I mean I don't get it.  You're asking me

11   what could possibly be in his file.  Well, you know,

12   you have the file, just -- why don't you either give

13   it to me or tell me.  This is -- I'm not understanding

14   what you're asking me to do.  You're asking me to go

15   through all the things that Bill Allred possibly could

16   have in his file?  That seems like a waste of our

17   time.

18             And, you know, you and I are friends for

19   20 years, so -- 25 years, so I'm not in any way -- I

20   just don't get -- I'm not even sure what I'm supposed

21   to be doing.  I'm supposed to be going through eight

22   pages of single-spaced e-mails and documents and tell

23   you what possibly could be in his file?  That doesn't

24   make a whole bunch of sense to me, what's in Bill's

25   file.

1                The only thing I know I've seen are these

2      two e-mails that you've marked as exhibits.  So tell

3      me what you want me to do.

4          Q        What you're doing.

5          A        Oh, I thought you just told me you didn't

6      want me to do that.

7          Q        Well, I don't -- I'm saying I don't need

8      the commentary.  I just need to know what documents --

9          A        But see, I don't --

10         Q        -- you can identify from what he's got.

11     And after we go through that, I don't mind you giving

12     the commentary, but I'm just trying to move it along

13     here.

14         A        Well, I mean it's kind of hard because

15     you're asking me to guess what documents are in his

16     file.  I mean he says -- all right.  By adding the

17     escrow language, the tender letter adds a demand.  So

18     obviously he must have a copy of the tender letter

19     rejecting her demand; right?  Is that -- that's what

20     you're asking?  He must have that.

21         Q        Yes.

22         A        He must have the demand.

23         Q        Sure.

24         A        So we've talked about the medical bills,

25     the liens, the demand, the tender letter rejection.

1    Let's see.  He obviously has the Frickey case.  He's

2    citing that.  He references -- he gives a valuation on

3    the value of the case.  So I'm assuming he has

4    something, medical bills or maybe the demand, Bill has

5    some documentation to form a significant --

6    recognizing it's a significantly greater case than a

7    $25,000 case.

8              Let's see.  He obviously must have the

9    police report because he's able to identify that it's

10   an absolutely clear liability case.  So maybe that

11   could be in his file.  It should be potentially, I

12   don't know, may not need it.

13             E-mails between Chop and himself.  Okay,

14   let's see, Dave Chop sends an e-mail, I spoke with

15   Dawn McFall.  Use this info.  Okay.  Have a report

16   from an agency they use locally.  So I was right, they

17   have their report, that's right, regarding there's no

18   liens.

19             They call it a Coweta County clerk

20   statement.  I assume he's talking about an oral

21   statement.  They went to the website, possibly theirs.

22   According to this report -- so he's got that report --

23   the hospital has not filed a lien.  He's got a lien

24   showing there's -- he's got a report showing there's

25   no liens.  Okay, now I'm going, flipping over.

1      Q       You're on to Exhibit 174?

2      A       2957.

3      Q       Okay, that would be 174.  That's the

4  August 10th, 2012, e-mail?

5      A       Right.  In his first real paragraph, he

6  says he attached the letter.  So he obviously has that

7  letter he's referencing, where he says it's a form

8  response and he would never use that in a Holt

9  situation -- or he says I would steer you away from

10  using a form letter.  Now, Peter, what time frame are

11  you asking me to say what's in Bill Allred's file --

12  your lawyer's file?

13      Q       Yeah, I was talking as of June 5th, what

14  would have existed in his file?

15      A       Whatever else the insurance company or

16  the TPA, Statewide, would have given him would

17  certainly be in there, you know.  So other than -- in

18  looking at these things, I've given you what is likely

19  to be in his file from just reading these two e-mails.

20      Q       But as you said, though, you can't say

21  with absolute certainty what was in his file because

22  you've not seen that; correct?

23      A       Right.  I can't tell you what was exactly

24  in his file until I see something.  I can't tell you

25  what's in there until I absolutely see it.  I know he

1  had a lot of stuff in his file, but my understanding

2  is you -- well, okay.  I wonder if there's some

3  motions out there -- I have a pretty good memory.  I

4  remember the briefs where you refused to produce it.

5  Weren't there some briefs there --

6      Q        No --

7      A        -- in the original file?

8      Q        -- what we're talking about is what

9  your -- Pete, you have been offered as an expert to

10  give an opinion in this case.  And part of your

11  opinions that you've at least addressed in your

12  October 10, 2017, letter revolved around these two

13  letters, as I understand it.

14      A        Right.

15      Q        And so my question is simply related to

16  what is your understanding, sitting here today, of

17  what Mr. Allred had in his file as of June 5th, 2012?

18  That's the only question --

19      A        He had a sufficient quantum of evidence

20  to tell you guys that you should have accepted the

21  demand.  That's what I go back to originally before we

22  went through this long exercise about guessing what's

23  in his file.  The only thing I have are the two

24  e-mails.

25              Now, I do recall I got some motions to

1  compel that was filed before the judge that you

2  opposed about getting his file.  And so I didn't look

3  at those either.  I don't know.  And you're asking

4  what's in my file to say what's in his file.

5  Regarding my new opinions, I was given these two

6  e-mails, you know that, and so -- anyway, I think I've

7  answered it.

8      Q      Well, you've said -- your testimony has

9  been is that he had enough information to make the

10  determination that he did, at least as represented in

11  these two exhibits, 168 and 174.  So I'm asking you

12  what that was.

13     A      Oh.

14     Q      And I think that's a fair question.

15     A      Well, that's different than what you

16  really just asked me to do.  You asked me to go

17  through and guess what's actually in his file that's

18  not in these exhibits.  But he clearly goes through

19  the basis of his decision in these e-mails and why he

20  thinks, you know, why he came to his conclusions,

21  based on the law, the evidence he saw, the discussions

22  he had, and he came to ...

23     Q      But my point is you're giving an opinion

24  based upon -- which does not take into account your

25  having seen specifically what was in his file.  That's

1    my only point.

2         A        Well, he gives a very good rationale of

3    why he thinks he should --

4         Q        That's not my question, though.

5                  MR. DOLDER:  Please don't cut him off.

6    BY MR. SCHMIDT:

7         Q        I'm sorry, I interrupted you.  I

8    apologize.

9         A        You're okay, don't worry about it -- of

10   the bases for his opinion.  And so I'm not sure how

11   much he even needed.  He could have had a conversation

12   with the adjuster and come to these conclusions.  And

13   so -- but obviously he references documents and did

14   some work for them to recommend that they pay it.

15        Q        Now, in this case, in the underlying

16   case, you understand that the trial judge found that

17   there was an enforceable settlement, right, the trial

18   judge?

19                 MR. DOLDER:  Object to the scope.

20        A        Yeah, I'd have to go back and look

21   exactly what the judge found.  I know it was appealed.

22   BY MR. SCHMIDT:

23        Q        I understand, but I'm talking about what

24   the trial judge did.

25        A        I can't -- I'd have to go -- before I

1    commit to that, on what the trial judge did -- if you

2    tell me that's true, then I'll accept it because I

3    know you to be -- you're not going to represent

4    something false.  I'd have to go back and look at

5    that.

6        Q       Well, I'd represent to you that the trial

7    judge enforced the settlement.  I mean, the record

8    will speak for itself.

9        A       Okay, yeah.  Like I said, I didn't go

10   back and review it.  And that was many months ago.  I

11   have a good memory, and I know -- I have great

12   recollection of the court of appeals decision saying

13   it wasn't a settlement.  But I don't remember per se

14   what the judge said in his order.  But okay, I accept

15   your representation.

16       Q       So obviously then, the court of appeals

17   disagreed with the trial judge; correct?

18       A       Apparently.

19       Q       And you'd agree with me that wanting to

20   protect liens to the extent they exist is a proper

21   thing to do?

22       A       You know, I can't agree with just a

23   blanket statement like that.

24               MR. DOLDER:  And Peter, just to clarify,

25         are you asking him reasonable -- from the

1            perspective of an insurance company?  Because

2            he's not an expert from the insurance industry.

3                 MR. SCHMIDT:  No, I'm asking him that to

4            the extent -- he is a plaintiff's lawyer -- is

5            aware of liens, that to the extent they are

6            valid and enforceable, it's proper to make sure

7            you protect those liens.

8       A       Well, to take into consideration the

9  appropriate way to handle them, I would qualify it.

10 So there's different -- there's a million different

11 situations.  There's a million different liens, and

12 they all have different strengths and exceptions and

13 enforceability.  So a blanket statement is a little

14 bit hard to agree to.  But you often analyze them.

15 BY MR. SCHMIDT:

16      Q       And every situation is probably slightly

17 different, you'd agree with that?

18      A       Not every situation.  You see

19 commonalities in these things.  But yeah, I mean you

20 look at a case-by-case basis.

21      Q       Now, what we know in this case -- and to

22 the extent this is causing to go back in memory, I

23 apologize, but I'll represent to you that this is what

24 the facts are.

25      A       Okay.

1     Q        But we know that on May 18th, Ms. Kemper

2  sent her demand letter to Statewide.

3     A        Okay.

4     Q        Or it was written that day, I guess.  We

5  know on June 4th, that a lien search was conducted and

6  it showed no liens.

7     A        Okay.

8     Q        And just for clarity of record, this was

9  a third party that did that; okay?  We then know on

10  June 5th, Mr. Chop sent his response to Ms. Kemper's

11  demand, including the $25,000 check, a limited

12  liability release.  I think there was a Social

13  Security -- or Medicare form in there as well.  Again,

14  I'm not trying to get you to say or verify what's in

15  these things.  I'm just trying to get a timeline here.

16     A        Setting me up with a timeline, thank you.

17     Q        And we next know that Ms. Kemper received

18  the check within the time of the demand, which was

19  June 8th; okay?  We know she received it before that

20  date or on that date; okay?  And then we know that

21  within two weeks, she went and visited with Mike

22  Werner and that they entered into a written agreement

23  on June 15th of 2012, just to give you those --

24     A        Thank you.

25     Q        -- time frames.  Now, would you agree

1    with me that enforceable liens could have been filed

2    between June 4th and the time Ms. Kemper received the

3    payment?  And we're just, for purposes of our

4    discussion, we're going to assume June 8th, her

5    deadline, okay, since she said that she received it

6    within the deadline.

7         A       By whom?

8         Q       Medical provider, hospital, doctor.

9         A       Are you going to ask me the is anything

10   possible question?

11        Q       Yeah.

12        A       I don't see it in this case, I want to be

13   clear.

14        Q       I understand that.

15        A       I don't see how that could possibly be

16   within the reasonable parameter of facts.  But as a

17   broad-based general proposition, anyone could file a

18   lien I guess at some point.

19        Q       So it is always possible a doctor, a

20   hospital, anybody could have filed a lien relative to

21   her accident between June 5th and when she received

22   the check, again, presumably June 8th, just to put

23   some dates on it?

24        A       I don't think so in this case.

25        Q       But it is possible that a hospital could

1  have?  That's my question.  I'm not saying that they

2  did.  I'm saying they could have.

3       A       I'm not sure it would be valid and

4  enforceable.  I guess you could -- another issue is --

5  anyone could file a lien just like anyone could file a

6  lawsuit, but I don't know that it would be valid and

7  enforceable, not under the facts of this case, I don't

8  think they could have.  But in this -- I mean you mean

9  from like an earlier treatment or --

10      Q       Yeah.

11      A       -- years ago?

12      Q       No, relative to this accident.

13      A       Like I mean before this accident she

14  could have had an ingrown toenail, they could have

15  filed one, or --

16      Q       I'm talking about this accident, Pete.

17      A       From this accident, I get that, I thought

18  that's what you were asking.  But I don't think there

19  was a basis to file a valid enforceable lien in that

20  time period, but ...

21      Q       Why do you say you do not think there

22  could have been a -- or possibly have been a valid

23  enforceable lien during that time frame?

24      A       Because there hadn't been one previously,

25  you confirmed that, and they weren't entitled to a

1   valid enforceable lien, as you saw from Mike Werner's

2   testimony and Bill Allred's e-mails.

3       Q       That's not my question.  My question is

4   regarding if a valid -- if a hospital or doctor could

5   have filed a lien, okay, one could have been filed

6   between June 4th and June 8th?  That's all my question

7   is.

8               MR. DOLDER:  That one I'm going to object

9          to as speculation.

10      A       Yeah, could you tell me on what basis,

11  like give me an example.  I'm having trouble finding

12  it out.

13  BY MR. SCHMIDT::

14      Q       All right.

15      A       You all went through the exercise, y'all

16  said no liens.

17      Q       That's not my question.

18      A       So tell me on what basis would someone

19  file a lien.  I'm just trying to -- you're just saying

20  they could have done it just because -- there were no

21  liens.

22      Q       As of June 4th, it was believed that

23  there were no liens; correct?

24      A       Right.

25      Q       We know Ms. Kemper was released from the

1   hospital -- and I'll defer to the record on this --

2   but I believe it was around May 23rd; correct?

3       A       Okay.

4       Q       And you understand that a hospital can

5   file a lien within 75 days, correct --

6       A       Okay.

7       Q       -- of someone being released from a

8   hospital; correct?

9       A       Okay.

10      Q       Yes or no?

11      A       I think that's right.

12      Q       So the June 4th through the 8th falls

13  within that 75 days; correct?

14      A       It would be from the date of release, of

15  course.  I mean that's -- you don't need me to answer

16  that, yeah.

17      Q       So whether a lien would be valid and

18  enforceable, a hospital could have filed a lien

19  between June 4th and June 8th?

20      A       Now, you're being hypertechnical, so I'm

21  going to be hypertechnical.  I'm going to agree with

22  you, I guess, but I'm going to say was it a Saturday

23  and Sunday, was it a -- I don't think there's a major

24  holiday there.  Is June --

25      Q       Okay.

1    A        They can't file it on a weekend, right,

2  because I don't think the courthouses are open to file

3  a lien.

4    Q        Well, let's carry that out then, and that

5  was the reason I gave -- because I was fearful you

6  were going to say that.

7    A        Well, I don't know.  So that's in your

8  mind, I can tell, so just tell what the days are.  I

9  mean you're being hypertechnical.

10    Q        Let's go from when -- June 4th to when

11  she signed the contract with Mr. Werner, which we

12  definitely know was June 15th.  Obviously there are

13  weekdays (sic) in between there.

14    A        For sure, for sure, let's hope.

15    Q        So between those days, you would agree

16  with me -- again, not getting into the validity of the

17  lien or not -- a lien could have been filed within

18  that period of time?

19    A        Can I say yes but one wasn't?

20    Q        Yes, you can.

21    A        Okay.  I guess.

22    Q        I understand that, I understand that.

23    A        I guess, under your anything-is-possible

24  scenario, okay.

25    Q        You'd agree with me that you are not

1    aware of any Georgia cases with facts identical to

2    those presented in Ms. Kemper's case regarding -- and

3    what I'm including in that in particular is the do not

4    contact me.

5        A        Since my last deposition -- I think you

6    asked me that question previously.  And since my last

7    deposition I have done no additional research on that

8    topic, although I have come in contact with similar

9    things in my practice.  I don't know that I've done

10   any research of cases that have come out since that

11   deposition.

12       Q        So you would, at least at this point in

13   time, agree as far as reported decisions, you're not

14   aware of any facts identical to the Kemper matter?

15       A        Nothing is coming to mind at the moment.

16   I mean they're all similar, you know, but you know how

17   the law is.  No two cases are alike when it comes to

18   reported decisions, so ...

19       Q        Now, are you aware that the pending

20   cases --

21       A        Can I qualify that?  'Cause I shouldn't

22   have opened my mouth.  But I say no two cases are

23   alike.  No two cases are exactly identical.  That

24   would be impossible in the history of jurisprudence

25   for them to be identical unless they come from the

1    same operative facts.  There are a lot that are alike.

2    I interrupted you.

3         Q         No, no, no, that's fine.  Are you aware

4    that this pending case by Equity is not being defended

5    on the basis of advice of counsel?  Do you know that

6    one way or another?

7         A         I don't know -- would you say this again?

8         Q         Equity has not raised a defense in this

9    litigation that you're testifying in on the basis of

10   advice of counsel.

11        A         Meaning we acted on the advice of

12   competent counsel?

13        Q         Correct.  Are you aware of that?

14        A         Well, they didn't act on advice of

15   competent counsel.

16        Q         Well, that's not my question.

17        A         So I -- I hate to be a wise guy.

18        Q         Yeah, I know.

19        A         They actually rejected their counsel's

20   advice.  So no, I guess -- I think I've seen that,

21   that -- I -- I hadn't seen ...

22        Q         Okay, I don't know what your answer was.

23        A         So the question is am I aware, or you're

24   making me aware that they're not raising that defense?

25        Q         Yeah, I'm asking you do you know on your

123

1   own that Equity has not raised the defense of advice

2   of counsel to Ms. Kemper's lawsuit?

3       A       I think I do know that they have not said

4   our lawyer told us to do it this way.  I don't think

5   they're doing that, if that's in my original file.

6   But I think I do know that.

7       Q       If you can answer this, do you agree that

8   advice of counsel, even if it's raised as a defense,

9   does not insulate or protect an insurer from bad

10  faith, if you know?

11              MR. DOLDER:  You're asking his legal

12          opinion?

13              MR. SCHMIDT:  Yeah.

14              MR. DOLDER:  Okay.

15      A       I think lawyers can make legal decisions

16  and still create bad faith, so ...

17  BY MR. SCHMIDT:

18      Q       No, I'm saying -- what I'm getting at

19  here, just to clarify, is that assuming that an

20  attorney gives poor advice on something, that does not

21  mean that that in and of itself relieves an insurance

22  company from its responsibilities?

23      A       Right, I would probably agree with that.

24      Q       You agree?

25      A       As you said, though -- and thank you for

124

1    qualifying that -- I haven't researched that issue for

2    purposes of today's deposition.

3        Q        No, and that's the reason I put that

4    caveat on there.

5        A        Can you tell me the answer to that

6    question?

7        Q        Off the record I will.

8        A        All right, tell me off the record.  Is

9    that an absolute defense?

10       Q        When we take a break.  In rendering your

11   opinions --

12       A        Wait, wait, I thought you were going to

13   tell me the answer to that off the record.

14       Q        Oh, I said when we take a break.

15       A        Let's just take a break right now.  I

16   want to know the answer to that.

17                        (Brief moment off the record.)

18   BY MR. SCHMIDT:

19       Q        In rendering your opinions -- and you may

20   not, just given what you've testified to, just to be

21   fair here, I'm not sure if you recollect this or not.

22   But in rendering your opinions, did you even at some

23   point in time review Statewide's -- what you

24   understood was Statewide's claim file?

25       A        A lot of it, I mean -- I don't know if it

1   was 100 percent accurate, but you know everything I

2   have in the file, you marked it at the last

3   deposition, so only you could probably tell me whether

4   I have the entirety of the file.  So I've given you

5   what I reviewed.

6        Q       Do you recall in the file there being

7   medical bills that you reviewed in Statewide's file?

8   And let's put some dates on this just to help here, is

9   I'm going only up to June 5th, okay, is that in their

10  claim file as of June 5th, that they had medical bills

11  in their file, are you aware of that?

12       A       Yeah, I think there is that.  And now I

13  consider it a memory test thing, which I was told that

14  wouldn't be part of today.  I would have done that, as

15  you know, I do.  But yes, they did have some -- we

16  talked about that in the last deposition.  They must

17  have had some level of medical bills.  I know that

18  they did that, right, didn't we cover that?

19       Q       Yes, we did.  And you know that there

20  were also assignments that Ms. Kemper or her power of

21  attorney had signed in the file; correct?  If you

22  recollect.  If you don't, the deposition will show --

23  the prior deposition will show what it is.

24       A       Right, let me stand on the prior

25  deposition.  I have it here.  And I can pull -- there

1    is a power of attorney.  Is that the question?

2         Q       Yes.

3         A       Yeah, I've got that.

4         Q       But there was also assignments as well,

5    correct, from Ms. Kemper and her power of attorney to

6    some of the medical providers?

7         A       Before I commit to that, will you either

8    show it to me or show me my testimony on that?  Again,

9    you know, I want to make sure I'm giving you an

10   accurate record.

11        Q       Let's keep going, just not to delay, and

12   I'll come back to that; okay?  Are you aware of any

13   reported cases -- and I may have asked this to you in

14   your last deposition -- I apologize if I did, but are

15   you aware of any reported cases where a claimant in a

16   time limit demand letter said do not contact me?

17               MR. DOLDER:  Yeah, I'm going to object

18          because you have gone way out of the scope of

19          the supplemental report.

20               But Mr. Law, do the best you can, please.

21        A       Yeah, I think that's not really fair

22   because I was told you would just be asking about this

23   October 10 thing and that this was going to -- and I

24   know you, Pete, so I knew you were going to -- you'd

25   take a quick deposition, you're efficient.

1           That was asked in my last deposition.  I
2    could not cite you a case at the time where they said
3    that, nor have I researched it since then.  So I'll
4    stand on my earlier response on that.  Nothing comes
5    to mind at the moment where that exact language was
6    used.  We did talk a lot about it, though, Peter,
7    about why Ms. Kemper did that.  But case law, I don't
8    have it.
9    BY MR. SCHMIDT:
10        Q       Now, in Bill's e-mails, Exhibits 168 and
11   174, he talks about Wellstar and the various
12   interpretations of that -- or his analysis, I'll put
13   it that way.  Would you agree with me -- and I'll put
14   the caveat on it I understand that it is your opinion
15   that Wellstar does not apply; okay?  I understand
16   that.
17        A       And Bill's too.
18        Q       I understand that.  But as far as
19   Wellstar is concerned is that an insurer has to
20   protect liens and its insured even if a claimant is
21   acting unreasonable?
22           MR. DOLDER:  Again, I'm going to object.
23        We are not offering him as an expert from the
24        insurance industry.  There hasn't been one
25        question as to the scope of what we're offering

1        him for.

2                Go ahead.

3    A        I don't even understand the question.

4    Did Bill say that he has to do that, or you're asking

5    me to interpret the Wellstar opinion from an insurance

6    company's viewpoint?  I'm not sure --

7    BY MR. SCHMIDT:

8    Q        He has referenced -- I think my question

9    is appropriate, just to respond to Rich, given that

10   you have at least relied on what the content of

11   Mr. Allred's correspondence are here as well as his

12   PowerPoint.  But my question was merely you'd agree

13   with me that under Wellstar, at least, that an

14   insurance company has to protect liens and its

15   insured?

16   A        That's a really broad question, and I

17   don't know that he says that as it relates to this

18   case.  And if there is a valid lien, do you take it in

19   consideration in analyzing on a case-by-case basis?

20   Would an insurance company do that?  You would hope

21   so.  You would think that they would, recognizing it

22   doesn't apply to this case, however.

23   Q        In the Kemper matter, do you agree that

24   at the very least, Statewide attempted to accept

25   Ms. Kemper's demand?  I'm not saying it was right or

                                                                   **129**

1    wrong -- or right, okay, I'll even go that far.  I'm
2    just saying they had attempted to accept her demand.
3        A       Is a counteroffer with unreasonable terms
4    an attempt to accept a demand?  If that's their effort
5    accepting it, I guess so.  I mean kind of.
6        Q       Okay.  But they did send her the $25,000
7    she demanded; correct?
8        A       They did.
9        Q       Now, just to be -- for me to be clear
10   here, because you didn't mention this earlier, have
11   you reviewed Mr. Quinley's or Mr. Evans' depositions
12   in this case?
13       A       No.
14       Q       So you're not providing any thoughts or
15   comments regarding their opinions, I take it then?
16       A       No.  Well, I may be in disagreement with
17   them or in agreement with them on certain things, but
18   I'm not -- obviously I haven't read them, so no.
19                   MR. DOLDER:  And I would just add, we
20          haven't deposed Evans.
21   BY MR. SCHMIDT:
22       Q       I meant the reports.  Pardon me if I said
23   deposition.  I apologize.
24       A       You did.  You did.
25       Q       I apologize.  And let me ask you, have

1  you reviewed their reports?

2      A      I don't think so.

3      Q      This may be beyond the scope of your

4  expert identification in this case, so please tell me

5  if in my asking this if that is so.  Assuming that

6  there are assignments in Statewide's file, do you have

7  any opinion on whether an insurer should consider

8  those assignments in deciding to pay a time limit

9  demand?  That may be beyond your ken, so I'm giving

10  you that preface.

11      A      I'm looking at Rich.  Am I being offered

12  for that?

13          MR. DOLDER:  I think -- well, I'm happy

14      to -- I feel like I've objected too much on the

15      scope of what we're offering.  And I'm happy to

16      go off the record and explain it to you.  I

17      don't want to interfere with your deposition

18      questioning.

19  BY MR. SCHMIDT:

20      Q      I'm almost done, actually.

21      A      I'm happy to step out of the room if you

22  guys want --

23      Q      No, no, no.

24      A      -- to have a conversation, too, to use

25  the bathroom.

1      Q       If you're not going to be offering an
2  opinion on whether an insurer should have considered
3  assignments or not, then I'll move on.  I just had
4  that and that was the reason.
5              MR. DOLDER:  We're not going to ask him
6         what an insurance company should and shouldn't
7         do.
8              MR. SCHMIDT:  Okay, fair enough.
9  BY MR. SCHMIDT:
10      Q       Now, you're aware that Ms. Kemper has
11  testified that she personally was not aware of any
12  liens; is that correct?
13      A       Right.
14      Q       She personally?
15      A       Right.
16      Q       Now, as a plaintiffs' lawyer, if you're
17  settling a case for a client, do you want to find out
18  or try to do some due diligence to find out if there
19  are liens or other interests before settling a case?
20      A       I think we covered this completely in my
21  first deposition.  Can I just refer you to that?
22      Q       You can answer it, and ...
23      A       I do talk with my clients about valid
24  enforceable liens and options thereunder.  I get
25  sufficient information, much like Mike Werner did.

132

1          Q          And do you rely on getting some of that

2     information from your client?

3          A          Sometimes, yeah.

4          Q          You consider that to be a good practice,

5     I presume?

6          A          Yes.

7          Q          Now, as far as your opinions in this

8     case, your opinions only relate to the events and the

9     circumstances that existed until -- or through

10    June 5th of 2012, when the demand was responded to by

11    Mr. Chop; is that correct?

12         A          I think I expressed opinions on the

13    reasonableness of Mike Werner's responses to that and

14    how he proceeded thereafter.  I certainly provided

15    opinions on that.

16         Q          Okay, let's just break that down so I'm

17    clear here.  Are you talking about opinions about Mike

18    Werner's interaction on behalf of Ms. Kemper after

19    June 5th?

20         A          Well, if you look at my initial

21    disclosure, I specifically addressed those types of

22    issues to advise her what a reasonable -- look at

23    page two of my initial disclosure, Mike Werner's

24    actions, upon learning about the content in the

25    June -- this is D, 1D -- upon learning the content of

1    the June 5th, 2012, counteroffer from David Chop to

2    Amy Kemper, advising her to decline the unreasonable

3    counteroffer and proceed with a lawsuit against Chris

4    Brown.

5         Q        I apologize.  I understand that, but --

6    and I may have not made my question clear enough.

7         A        I accept your apology, and you did not

8    make it clear because you said up to when he sent that

9    demand.

10        Q        Yeah, I'm talking about facts and

11   circumstances up to.  In other words, what Mike may

12   have done was based upon what was done up through

13   June 5th of 2012.  You follow me?

14        A        Have I responded to the rejection?

15        Q        I understand you're saying what Mike did

16   after that date.  But I'm saying that's all based upon

17   facts and circumstances that existed from June 5th

18   backwards.

19        A        Well, I don't know if I agree with that.

20   I have other evidence it happened afterwards in my

21   file.

22        Q        I understand that.

23             MR. DOLDER:  I was going to say when the

24        witness was reading from his report a bit ago,

25        that is Deposition Exhibit 160.

1           MR. SCHMIDT:  Thank you.

2   BY MR. SCHMIDT:

3       Q       Yeah, just hear me out here.  Exhibit 168

4   and 174 are obviously in August of 2012, after

5   June 5th of 2012.

6       A       Right.

7       Q       You would agree with me, however, that

8   the content of these e-mails relate to what Mr. Allred

9   states occurred up to June 5th of 2012?

10      A       Right, I get that.  And I understand --

11  maybe today is just a hypertechnical day, but you

12  asked me if those were the only facts I was relying on

13  in all my opinions.  And I don't.  For example, Mr.

14  Wetzel and Equity consented that the value of the

15  claim was $10 million.  And then Bill Allred says it's

16  $3 million.

17          The point is we know from objective

18  evidence that occurred after June 5, that the value of

19  the claim as reflected by the reasonable -- anyone

20  reasonably, whether it's plaintiffs' lawyers or

21  whatever, was massively in excess of the limits at the

22  time the demand was done.  So is that the question,

23  like you're saying --

24      Q       No.

25      A       -- I'm not relying on any evidence that

1  happened afterwards?

2      Q       No, I'm not saying that.  What I'm

3  talking about is relative to -- you know what, I'm

4  going to withdraw the question.

5      A       Thank you.

6      Q       Let's take a five-minute break.

7      A       Great.

8      Q       And then I will wrap it up.

9                  (Recess from 12:33 to 12:42 p.m.)

10  BY MR. SCHMIDT:

11      Q       Going back to Wellstar again, I

12  understand your testimony is that based on the facts

13  of Wellstar, that it's your opinion, or at least

14  observation, that it would not apply to Ms. Kemper's

15  demand; correct?

16      A       Okay.

17      Q       Are you aware of any cases that say that

18  it does not apply to a situation like Ms. Kemper's,

19  specifically like her situation?  I know, understand

20  what it says about existing liens and things of that

21  nature.  But are you aware of any cases that state

22  that when there is uncertainty or you know of no

23  liens, that Wellstar should not apply?

24              MR. DOLDER:  Objection, compound.

25      A       Well, when you say am I aware of any

136

1   cases, doesn't Bill Allred tell the insurer that in
2   his long analysis when he says -- isn't there another
3   case he cites following that?
4   BY MR. SCHMIDT:
5       Q       I don't believe so, but --
6       A       Does he not?  Let's look at that
7   68-page -- I thought he did somewhere cite a
8   subsequent interpretive case regarding that.  But if
9   not, no.
10      Q       I'm not aware of it.
11      A       Okay.  Then if he didn't -- if you tell
12  me he didn't, then, you know, okay.  Nothing comes to
13  mind at the moment.
14      Q       Looking at your report, in the third
15  paragraph, the third full paragraph there, it says
16  Bill Allred advised that because Kemper had health
17  insurance as a public employee, there were unlikely to
18  be any valid and collectible hospital liens.  I am not
19  aware of any verification of that fact, that there
20  were no definitively versus unlikely -- if you see
21  what I'm making, the parsing there.  Let me start
22  over.
23      A       I thought that was good.
24      Q       You've made the statement that Bill
25  Allred advised that because she had health insurance

137

1   and was a public employee, that it was unlikely she

2   would have -- there would be any valid or collectible

3   liens; correct?

4       A       Right.

5       Q       As a lawyer, do you advise clients on

6   assumptions?

7       A       Yes.

8       Q       Okay.  So you believe that where a person

9   has an excess of $1 million of medical damages, that

10  as an attorney, it is appropriate to tell a client

11  that it is unlikely that there to be valid and

12  enforceable liens without verifying that?

13      A       I didn't say that.  But he did verify it,

14  and --

15      Q       Who's he?

16      A       Bill.

17      Q       Okay.  How did he verify that?

18      A       He did several things, such as his first

19  e-mail there, 2950.  He --

20      Q       Say Exhibit 168.  Is that --

21      A       Is that -- okay, yeah, 168.  He

22  recognizes that she's a state employee, which is the

23  same analysis that Mike Werner went through.  He says

24  it made it more likely that her bills had been paid in

25  that time, or had been paid and that she -- you know,

1    he goes on -- I can read it -- but he goes on to say

2    she'd be obligated to group health insurer, blah,

3    blah, blah.  He says it's unlikely that she has any

4    liens that would affect her.  Then he goes down and

5    tells in depth all the things he did to confirm there

6    were no liens, like hiring a third-party vendor, which

7    is pretty advanced, pretty good stuff.

8        Q        That's not my question.  I want you to

9    stick with the sentence that I'm on.

10       A        Oh.

11       Q        And that is that it is -- how do you --

12   well, I'll ask it this way.  How do you determine --

13       A        Can I say something, though, because you

14   did say so it is your opinion that it is okay with

15   $1 million in medical bills to whatever your question

16   was.  So it kind of really was your question, Peter.

17   And when you say that's not my question, maybe you

18   didn't ask it artfully, but your question was asking

19   me -- I'm trying to defend myself a little bit because

20   that is the question you asked.

21       Q        Yeah, but you're getting into other

22   issues here, and what I am asking is focusing on the

23   health insurance.  How did Mr. Allred know that just

24   because she was a public employee that had health

25   insurance, that there would not be valid and

139

1    collectible hospital liens?

2              MR. DOLDER:  Objection, foundation,

3         speculation.

4         A         Right.  We covered this at length in my

5    last deposition as it relates to Mr. Allred.  He

6    apparently went through the same legal analysis based

7    upon his experience and training that it's not a

8    self-funded ERISA lien, being that she worked for the

9    government, and that she would not have a lien.  He

10   says that as clearly as possible there.

11   BY MR. SCHMIDT:

12        Q         Point that out to me where he says that.

13        A         Given the large amount of medical bills,

14   although we knew she was a state employee, which made

15   it more likely that her medical bills had been paid

16   and that she, and not you, would be obligated to her

17   group health insurer.  I can cite you that as part of

18   the analysis there.  Is that the question?

19        Q         It was in part, but my question is did he

20   verify that with the health plan?

21        A         That's a question for you, your lawyer.

22        Q         I'm asking you.  Do you know if --

23        A         He was your lawyer.  You tell me.  I

24   mean, from his thing, he comes to a conclusion at the

25   end of the e-mail that there were no valid liens.  Did

1  he go out and verify it?  I guess he did.  I guess he

2  found out that she was a state employee and applied

3  his experience and knowledge of the law to it and told

4  his client that it was unlikely there would be a lien.

5      Q     Okay.  If you were representing someone

6  and you wanted to find out if there would be a lien

7  relative to health insurance potentially, self-funded

8  plan, how would you go about confirming that?

9      A     You and I covered this extensively in my

10 first deposition.

11            MR. DOLDER:  And I'm sorry, but if you

12        represent someone, I just have a problem with

13        someone because we're dealing with so many

14        perspectives here from the, you know, what the

15        witness is opining on, so --

16            MR. SCHMIDT:  I'm asking him as far as if

17        he represented a claimant.

18            MR. DOLDER:  And that's fine, thank you.

19     A     But I covered this extensively, Peter, in

20 my first deposition.  You and I went through this line

21 by line.  What is the question again, how do I go

22 about finding out if there is a lien?

23 BY MR. SCHMIDT:

24     Q     No.  Let me start it again.  You've made

25 a statement in here, or at least put in here that

1   because Kemper had health insurance as a public

2   employee, there were unlikely to be any valid and

3   collectible liens.

4        A        Said Bill Allred advised that because

5   Kemper had health insurance as a public employee,

6   there were unlikely to be any valid or collectible

7   hospital liens.

8        Q        Okay.

9        A        And that's the same thing that we covered

10  in my last deposition where Mike Werner came to the

11  same exact conclusion.  I think I even said I was

12  proud of Mike and that -- no, that wasn't the part

13  where I said I was proud of him.  Okay, so that's what

14  I said.

15       Q        And my question, though, focused on can

16  you point to any evidence that Mr. Allred verified

17  through communication with the healthcare provider, or

18  the group, that there would not be any liens, it

19  wasn't self-funded?

20               MR. DOLDER:  Objection, compound and

21          vague.

22       A        Well, all I'll say is the only thing I've

23  got is the two exhibits you've put in front of me, 168

24  and 174, and then obviously his other exhibit, that

25  lengthy 68-page thing addresses some of this.  But

1   that's all I've got.  It speaks for itself.  He says

2   what he says and why he concluded that he did.  And --

3   BY MR. SCHMIDT:

4       Q       So the answer is -- didn't mean to

5   interrupt you.

6       A       Sure.

7       Q       So the answer is you've not seen any

8   document wherein Bill Allred had communications with I

9   believe DeKalb County, verifying that they may not

10  have subrogation rights?

11      A       Beyond what's in these two exhibits, no.

12      Q       Now, is it your opinion that when

13  Mr. Werner met with Ms. Kemper at the hospital on or

14  about May 18th, that he was her lawyer at that time?

15              MR. DOLDER:  I'm going to object to the

16          scope.  It's not within his supplemental

17          report.

18      A       Yeah, I've got to say -- and I know we

19  covered it in my first depo, you know.

20  BY MR. SCHMIDT:

21      Q       It's in your report, so that's the reason

22  I'm asking it.

23      A       Where in my report?  Which line are you

24  talking about?

25      Q       It says in the third paragraph, thus it

1   was all the more reasonable for Mr. Werner to tell Amy

2   Kemper that there was no need for her to hire an

3   attorney in order to settle her claims against Brown,

4   and so forth and so on.

5            So my question is are you saying that

6   Ms. Kemper -- or rather, Mr. Werner and Ms. Kemper did

7   not have an attorney-client relationship as of

8   May 18th?

9        A     Well -- yeah, I understand your question.

10  I don't think he was intending to charge her a fee and

11  to represent her, but that does not mean he doesn't

12  have legal obligations to her to advise her

13  appropriately of her rights when he is doing that.

14       Q     So you would agree, then, that although

15  he may not have been taking compensation, he was

16  providing her legal advice that would create a

17  lawyer-client relationship?

18       A     I didn't -- that last statement, I don't

19  know that it creates a lawyer-client relationship.

20  I'd be happy to look back at all that exact

21  communication, which I was told I didn't need to do

22  for this deposition, and check the bar rules on that.

23            I don't know that that necessarily

24  creates a lawyer-client relationship, although no

25  written contract is required to create a lawyer-client

1    relationship, if I understand the bar rules.  It's

2    strongly encouraged, and they later engaged in a

3    formal written letter, as we know, or agreement,

4    written agreement.

5              So can you have privilege at that point,

6    which is different from whether you have an

7    attorney-client relationship?  You can.  You can --

8    someone can tell you something in anticipation of

9    obtaining the relationship, which would be privileged.

10             Does he have an obligation ethically and

11   probably legally to tell her her rights appropriately?

12   Yeah, I think he would when someone is asking you

13   advice like that.

14             So does it actually create a binding

15   attorney-client relationship?  That, I don't know.

16   I'd have to look at that closer at the underlying

17   record a little more.  I wasn't -- I thought it was

18   agreed that I wasn't coming here to answer those

19   questions on the underlying factual things because I

20   answered them all earlier.  But I think that gets you

21   pretty close.  Because you're reading into my

22   sentence, but for -- it says directly in that letter

23   she doesn't need to hire an attorney.

24        Q    Are you aware that Bill Allred saw

25   Mr. Werner's demand letter as a setup?

1      A       No, he did not.  Is that what Bill said,

2   Peter?

3      Q       Well, the record is what the record is.

4      A       I mean his e-mails certainly don't lend

5   support to that, I'll say that to qualify.  His

6   e-mails certainly don't lend support.  If anything,

7   they lend support to the opposite, that it was not a

8   setup.

9      Q       Now, in your final paragraph on page two

10  of your report, you talk again, you go back to the

11  issue of Statewide having counsel versus Brown having

12  counsel at the time of the demand letter.

13     A       Uh-huh.  (Witness answers affirmatively.)

14     Q       Are you saying it is custom and practice

15  for an insurance company to hire separate counsel for

16  an insured at the time a demand is made?

17     A       Not in an absolute sense, no, not to hire

18  it.  To recommend it, sure, it's done often.  But to

19  hire someone for them at that stage, you would think

20  that they would -- well.

21     Q       Assuming separate counsel was retained

22  for Mr. Brown -- and I think what you wrote in your

23  letter, they would write a hammer letter is what you

24  called it, to Statewide, are you providing any

25  opinions regarding what a reasonable attorney would do

1    in addition to sending a hammer letter to protect

2    Brown from personal liability?

3              MR. DOLDER:  Could you read the question

4         back please?

5              (Whereupon, the court reporter read back

6         the last question.)

7    A         I think I am, yes.  And I think it's

8    clearly outlined in my first opinion letter and

9    discussed -- my first expert disclosure.  I outline

10   things like that.  And then -- so yeah.

11   BY MR. SCHMIDT:

12   Q         Yeah, let's look at that because I don't

13   know if I understand that.  Because what I'm saying is

14   in addition to the hammer letter, what would an

15   attorney do to make sure that someone in Mr. Brown's

16   position would be protected?

17   A         Well, that's easy.  Mr. Brown was charged

18   with serious offenses; right?  So you would, for

19   example, be the go-between to cooperate between him

20   and his Fifth Amendment right against

21   self-incrimination is one example of how I see things

22   like that often.  That would be something we could

23   discuss.  So you would try to maintain reasonable

24   cooperation while protecting Mr. Brown's interests --

25   reasonable cooperation with the insurance company.

1    Q        And maybe I didn't narrow that enough --

2    A        Yes, I did --

3    Q        -- to focus on with respect to liability

4    in a civil setting -- yeah, in a civil setting.

5              MR. DOLDER:  What's the question?

6    A        So you get a demand.  What do you do, is

7    that the question?

8    BY MR. SCHMIDT:

9    Q        Yeah, I mean if you're representing Mr.

10   Brown and you send a hammer letter, would you be

11   asking that a -- are you giving an opinion regarding

12   whether a release should be provided, what the release

13   should contain, not contain?  Are you giving any

14   opinions regarding that?

15   A        Well, that's fact specific.  But in a

16   case like this, if I was giving advice, I would say

17   please accept the demand.

18   Q        Okay.

19   A        Worry about the release later.

20   Q        Okay.  So --

21   A        Accept the demand, then later back, you

22   can go back with your proposed what-ifs, almost like

23   exactly what Bill Allred says.  He could have done the

24   job well.  What if.  Call the lawyer and say hey, how

25   is this, how is that.  That's the way it's done.  I

```
 1    deal with that all the time, dealt with that this week
 2    in an unrelated case.
 3                 So yeah, there's a lot of things that are
 4    tangential, relate around logistics, not just the
 5    hammer letter.  If you're limiting your question to
 6    specific things, you're -- a lawyer protecting Mr.
 7    Brown would ...
 8         Q      If you recall, just based on what you
 9    just said, do you recall any e-mails from Mr. Allred
10    to Mr. Chop or anyone up until June 5th, 2012 -- not
11    after, now -- wherein it provides that let me call the
12    lady, let me do any proactive work on this claim?
13         A      I'm not understanding that question at
14    all.  Tell me what you're asking.
15         Q      Are you aware of any e-mails --
16         A      From whom?
17         Q      Mr. Allred --
18         A      Okay.
19         Q      -- to Mr. Chop or anyone at Statewide on
20    the Kemper claim, saying let me contact Ms. Kemper,
21    for example?
22         A      Well, he says what he says in his thing.
23    And in his e-mails -- I'm looking at 168 and 174 -- he
24    says you guys rejected my offer to help.
25         Q      I hear what you're saying.
```

149

1          A          Okay.

2          Q          But I'm talking about documents up until

3    June 5th with Mr. Allred.  Not after.  Before.

4          A          After, he says I offered to give you to

5    handle it.

6          Q          We're talking cross each other.

7          A          Okay.

8          Q          I'm asking of any documents that are in

9    the file, that you've seen from Mr. Allred, anyone,

10   wherein Mr. Allred has said, in writing -- I'm not

11   talking about this -- let me start all over again.

12                    I'm not talking about this two-plus-month

13   later correspondence; okay?

14         A          Where he says what he did before

15   June 5th?

16         Q          That's right.  I'm asking you, did you

17   see any written communications from Mr. Allred

18   specifically saying let me write a letter, let me

19   contact her, let me do X, Y, and Z?

20                    MR. DOLDER:  I'm going to object to your

21          question because it misrepresents the exhibit.

22         A          Right.

23                    MR. DOLDER:  Which is an e-mail string

24          that does have earlier e-mails.

25         A          Right.

1              MR. DOLDER:  So it's not just after the

2         fact.

3      A         And it's an e-mail chain where he had

4    offered to do that before the fact but was rejected by

5    Equity, or Statewide, or both, and he's con- -- you

6    know, so maybe we're talking, as you said, cross each

7    other.

8              Tell me again how -- they're clearly

9    dealing with -- first, again, I go back to this

10   question.  The only documents I have from Allred are

11   the ones that you know I have.  So I haven't seen a

12   proposed limited release Allred gave.  He offers to do

13   some of this stuff and contact people and handle it,

14   or he suggests it, whatever, in his e-mail, I should

15   say that.  I haven't seen any of those documents.

16   What I've seen is what you know I have, which are

17   sitting in front here.

18   BY MR. SCHMIDT:

19     Q         Okay, of these exhibits, I'm just trying

20   to understand -- it says I've pasted below the last

21   communication from Dave to me regarding this matter.

22     A         The last.

23     Q         Yes.

24     A         Not the first.

25     Q         Understood.

1      A       Okay.

2      Q       But the only e-mail that I see that is

3   attached are on Exhibit --

4      A       Where's my second e-mail?  Oh, there it

5   is, thanks.

6      Q       Well, I'm looking at the first one first.

7      A       Okay.

8      Q       Which I believe is what, 168?

9              MR. DOLDER:  Do you have 168?

10             THE WITNESS:  I do.  I'm looking at it

11       right now.

12   BY MR. SCHMIDT:

13     Q       Okay.  And I think the attached e-mails

14   he's referring to on that exhibit are ST2951 and 2952.

15     A       The second e-mail.

16     Q       Right, or the e-mail chain he's

17   referencing.

18     A       So what's the question?

19     Q       Do you agree with that?

20     A       Agree with what?

21     Q       That that is the e-mail chain that he is

22   referring to.  An objection was made that I was

23   misrepresenting something, and I'm just trying to

24   clarify.

25     A       I don't think that was the objection.  I

1    think the objection was -- look at the first, 168, it

2    has e-mails predating August.  It goes back to June 5.

3    And then there's another one -- and let me ask you a

4    question.  I see -- okay, the exhibit you're showing

5    me has a date on it originally of 8-10-12.  Is the

6    mail received below it where it says 14, that's just a

7    forwarding e-mail?

8        Q        Let me pull that and have it in front of

9    me.

10       A        174.  Let me see yours.  See like all

11   this down here, what is all this?

12       Q        Yeah, I cannot attest to what the meaning

13   of that is.

14       A        Okay.

15       Q        Okay?

16       A        On 174.

17       Q        Okay.

18       A        All right.  Okay, so the question is --

19       Q        Let me go twofold.  First question, with

20   respect to Exhibit 168, the e-mails on page ST2951 and

21   to the signature page 2952, those appear to be the

22   attached e-mails Bill Allred sent as part of his

23   August 9, 2012, e-mail, which is the first page of

24   Exhibit 168?  If you know.

25       A        I really don't because 168 says I pasted

153

1  below the last communication from Dave to me regarding

2  this matter.  And the question is those e-mails are

3  174?

4       Q       No.

5       A       Are those the e-mails referencing 174?

6       Q       No.  Here's what I'm talking about.  The

7  ones I've done just in the yellow strike-through --

8       A       Okay.

9       Q       -- are dated June 5th of 2012; correct?

10       A       Okay, yes.

11       Q       These are the only e-mails that I know

12  were attached to Mr. Allred's August 9th e-mail, 2012,

13  Exhibit 168.

14       A       Right, okay, that's correct.

15       Q       Okay, you agree with that.  I do not

16  see -- moving on to 174, now, I do not see any

17  attached e-mails from June of 2012 as attachments to

18  that Exhibit 174.

19       A       Agreed.

20       Q       Okay.  And going back to my original

21  question, which was, among other things, what did --

22  strike that.

23               Looking at the e-mails beginning on

24  page two of Exhibit 168, are there any statements by

25  Mr. Allred stating that he will undertake to do

1  anything specifically regarding this claim?

2              MR. DOLDER:  Can you reread the question,

3        please?

4     A       I got it.  But go ahead.

5              (Whereupon, the court reporter read back

6        the last question.)

7  BY MR. SCHMIDT:

8     Q       And what is that?

9     A       For one, he starts by saying he attaches

10 the lien issue on the liens.  He offers -- then it

11 speaks for itself, but he speaks all the different

12 things he could do regarding that.

13    Q       Anything else?

14    A       Now, part of this e-mail is page one.  Do

15 you want me to comment on page one --

16    Q       No, I'm talking about --

17    A       -- or just page two?

18    Q       -- the June 5th, 2012 e-mails.  That's

19 all I'm talking about.

20    A       Okay, that's what he says which was the

21 most recent e-mail.  I don't know if there were

22 earlier ones on June 5th, 2012.  But that's -- Bill

23 says he's dealt with the lien issue, there are none.

24 He says what he says in that sentence.

25    Q       Okay.  But he does not say in these

155

1    e-mails -- understanding there may be other ones,

2    okay -- but in what you've got before you, which is

3    all you've got, he's not saying anything in here

4    regarding I'll draft a release, does he?

5         A       He does.  He says -- not about drafting

6    it, but they discuss it, drafting a release, and Dave

7    Chop at Statewide says I'll do it.

8         Q       Okay.

9         A       Bill offers.  Let me know if you need me

10   to do anything else.  Will you be tendering the full

11   25 with a limited release.  Dave said -- you see that

12   earlier e-mail.  Then Dave says I'm preparing the

13   limited release.  So Bill says okay.

14              Then later Bill, as that e-mail --

15   because it's part of page two -- says, I believe he

16   said, I advised Dave that he should accept the demand

17   and that I was happy to draft a limited liability

18   release for him --

19        Q       I'm understanding that.

20        A       -- and get it to Ms. Kemper.  Now, since

21   page one carries over to page two -- I'm just putting

22   it all in context.  But -- so you want me to --

23        Q       I'm focusing on, again, page two of

24   Exhibit 168 and what occurred on June 5th, or at least

25   this portion of what we know occurred on June -- or

1   exchanges that went on on June 5th, 2012; okay?

2              And my statement was simply what did Bill

3   say that he would undertake to assist Mr. Chop on this

4   claim?

5        A        He said he offered to draft a limited

6   release.

7        Q        Again, you're referring to the first

8   page, which is an August 2012 e-mail.  I'm talking

9   about this one single page.

10       A        Yeah, but that page is, first of all,

11  part of the --

12       Q        Okay.

13       A        Let me finish.  He says that is our last

14  communication.  So when he says in the next

15  communication I offered to draft the release, doesn't

16  that necessarily qualify the last communication?

17             I mean -- but in this document, they

18  address the release.  You don't need me to answer this

19  question.  Dave Chop says I'll draft it.  Bill says

20  okay.  Now, Bill says I said I offered to draft it in

21  that conversation apparently.  But --

22       Q        I'll take from that that you're unwilling

23  to answer my question on page two.  There is nothing

24  that says in there that Bill will undertake to draft a

25  release; correct?

1          MR. DOLDER:  Objection, asked and

2      answered.

3      A       I'm going to say I will answer any

4  question for you, Peter.  And on that page, those

5  written words are not made, but they are made on the

6  next page, so ...

7  BY MR. SCHMIDT:

8      Q       We understand that, Pete.  And I'm not

9  trying to dispute that.  What I'm saying is what we

10  knew on June 5th of 2012.

11      A       I know Bill Allred, and I know he's an

12  honest guy like you.  And I know that he said that I

13  said I offered to draft it.  And I'm assuming that --

14  it's pretty obvious from this communication that when

15  they were talking about drafting a release, he offered

16  on June 5, I'll draft it.  Dave must have said no,

17  I'll do it.  And Bill says okay, thanks, let me know

18  if you need anything.

19      Q       But again, you're making an

20  interpretation, you're not -- you don't know?

21      A       I feel like I do know.  But on page two,

22  he does not use the words I'll draft a release, if

23  that answers your question.  Dave said he would.

24      Q       He doesn't say on page two, let me call

25  Ms. Kemper, does he?

158

1       A       He does not say that on page two.

2       Q       That's all I've got.  Thank you.

3       A       No lawyer compliments you as much as I do

4    during a deposition.

5               MR. DOLDER:  We'll read and sign, and

6          we're off the record.

7                   (Deposition concluded at 1:17 p.m.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

159

```
 1              E R R A T A   S H E E T
 2       I, the undersigned, PETER A. LAW, do hereby
 3   certify that I have read the foregoing deposition and
 4   that, to the best of my knowledge, said deposition is
 5   true and accurate (with the exception of the following
 6   corrections listed below.)
 7   PAGE/LINE        CORRECTION (and reason for correction)
 8   _____/_____
 9   _____/_____
10   _____/_____
11   _____/_____
12   _____/_____
13   _____/_____
14   _____/_____
15   _____/_____
16   _____/_____
17   _____/_____
18   _____/_____
19   _____/_____
20   _____/_____
21
22                         _____
                                     Signature
23   _____
     Notary Public
24   Date_____
25   My Commission Expires:_____
```

160

1                    C E R T I F I C A T E

2    STATE OF GEORGIA:

3    COUNTY OF GWINNETT:

4

5         I hereby certify that the foregoing proceedings
     were reported as stated in the caption and the
6    questions and answers thereto were reduced to
     writing by me; that the foregoing pages 83 through
7    158 represent a true and complete transcript of the
     evidence given on November 3, 2017, by the witness,
8    PETER A. LAW, who was first duly sworn by me.

9         I certify that I am not disqualified for a
     relationship of interest under O.C.G.A. 9-11-28(c);
10   I am a Georgia Certified Court Reporter here as an
     independent contractor of Q&A REPORTING SERVICES,
11   INC.; I was contacted by Q&A REPORTING SERVICES,
     INC., to provide court reporting services for this
12   proceeding; I will not be taking this proceeding
     under any contract that is prohibited by O.C.G.A.
13   15-14-37(a) and (b) or Article 7.C of the Rules
     and Regulations of the Board; and by the attached
14   disclosure form I confirm that Q&A REPORTING
     SERVICES, INC., is not a party to a contract
15   prohibited by O.C.G.A. 15-14-37 or Article 7.C of
     the Rules and Regulations of the Board.

16
          This, the 6th day of November, 2017.
17

18

19

20

21        _____
          LYNN VAN RY, RPR
22        CCR No. B-1120

23

24

25

161

1           COURT REPORTER DISCLOSURE STATEMENT
         STATE OF GEORGIA  //  COUNTY OF GWINNETT
2               DEPOSITION OF PETER A. LAW

3

         I, LYNN VAN RY, Certified Court Reporter, do
4    hereby disclose pursuant to Article 10.B of the
     Rules and Regulations of the Board of Court
5    Reporting of the Judicial Council of Georgia that
     I am a Georgia Certified Court Reporter; I was
6    contacted by Q&A REPORTING SERVICES, INC., to
     provide court reporting services for this
7    proceeding; I will not be taking this deposition
     under any contract that is prohibited by O.C.G.A.
8    15-14-37(a) and (b) or Article 7.C of the Rules
     and Regulations of the Board; and I am not
9    disqualified for a relationship of interest under
     O.C.G.A. 9-11-28(c).

10

         There is no contract to provide reporting
11   services between myself or any person whom I have
     a principal and agency relationship nor any
12   attorney at law in this action, party to this
     action, party having a financial interest in this
13   action, or agent for an attorney at law in this
     action, party to this action, or party having a
14   financial interest in this action.  Any and all
     financial arrangements beyond my usual and
15   customary rates have been disclosed and offered
     to all parties.

16

         This, the 6th day of November, 2017.

17

18

19

20

21                    _____
                      LYNN VAN RY, RPR
22                    CCR No. B-1120

23

24

25