# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

Amy Marie Kemper,

                Plaintiff,      Case No. 1:15-cv-02961

v.                            Michael L. Brown
                                 United States District Judge

Equity Insurance Company,

                Defendant.

_____/

## <u>OPINION & ORDER</u>

This bad faith failure to settle case arises from an automobile incident between Defendant Equity Insurance Company's insured, Christopher Brown, and Plaintiff Amy Marie Kemper. Both parties have filed motions for summary judgment. (Dkts. 235, 239.) Ms. Kemper has also moved to exclude part of expert J. Randolph Evans's testimony (Dkt. 258) and to supplement her motion for summary judgment (Dkt. 266). For the reasons set forth in this order, the Court grants Equity's motion for summary judgment, grants in part and denies in part Ms. Kemper's motion to supplement, and denies Ms. Kemper's motions for summary judgment and to exclude Mr. Evans's testimony.

## I.    Background

In March 2012,  Christopher Brown drove his vehicle across a road's center line into oncoming traffic and struck Ms. Kemper, who was riding her motorcycle.  (Dkt. 252-1 at 1.)  Mr. Brown was drunk.  (Dkt. 224-1 at 2.)  Ms. Kemper was injured and airlifted to a hospital.  (Dkt. 235-9 ¶ 3.)

Brown had an automobile liability insurance policy with Equity that provided $25,000 per person in bodily injury liability coverage.  (Dkt. 224-165 at 2.)  Equity retained Statewide Claims Service to adjust Ms. Kemper's claims against Mr. Brown.  (Dkts. 224-1 at 1; 252-1 at 5–6.) Statewide and its adjuster, Mr. Chop, began working on Ms. Kemper's claims after they received notice of the accident and the police report. (Dkt. 252-1 at 5–6.)  Statewide confirmed the insurance policy provided liability coverage for the accident and concluded Mr. Brown was at fault for the accident.  (*Id*. at 7–8.)

In April 2012, Statewide received a claim form that included Ms. Kemper's $24,456.92 air ambulance bill and an authorization and consent with an assignment of benefits and lien provision, which Ms. Kemper had not signed.  (Dkts. 223-5 at 2; 252-1 at 8.)  Statewide also received several medical bills and statements for medical expenses Ms.

Kemper incurred because of the accident. (Dkts. 116-1 at 53:1–6, 54:1–23; 223-5 at 5–7, 9–10, 12.) Mr. Chop concluded that Ms. Kemper's medical bills exceeded the $25,000 policy limit. (Dkt. 116-1 at 55:2–23.) He sent Mr. Brown a letter acknowledging the loss under the insurance policy. (Dkt. 224-4 at 1.)

In April 2012, Mr. Chop sent Ms. Kemper a letter and requested that she provide a medical update or medical bills, medical records from her treating physicians, and information about any lost wages. (Dkt. 224-10 at 1.) Attorney Michael Werner helped Ms. Kemper draft a demand letter in response. In it, Ms. Kemper offered to sign a limited release in exchange for the liability policy's limit. (Dkt. 224-11 at 1.) She stated the release must not have any language about her paying Mr. Brown's or Equity's "incurred costs" and that Equity must deliver the check to her before June 8, 2012. (*Id*. at 1.) Ms. Kemper also wrote "PLEASE DO Not contact me, or my Friends as this DEmand is very simple [sic]." (*Id*. at 2.) Mr. Chop received the letter, evaluated Ms. Kemper's claims, and concluded her medical bills exceeded the insurance policy's limits. (Dkts. 116-1 at 92:24–93:19; 224-18 at 3.)

Statewide knew Ms. Kemper's medical bills were extensive and, not knowing whether she had adequate medical coverage, feared medical providers would file liens on her claims against Mr. Brown. (Dkt. 224-1 at 5–6.) Statewide enlisted attorney Bill Allred, the founder of an insurance-defense firm, to assist. (Dkts. 205 at 65:8–16; 224-93 at 1; 235-3 at 1; 252-1 at 40.) He, in turn, hired another company to determine whether any of Ms. Kemper's medical providers had filed liens on her claims against Mr. Brown. (Dkts. 224-1 at 8; 224-168 at 1; 252-1 at 45.) That company found none. (Dkt. 224-1 at 8; 252-1 at 45.) Nevertheless, Statewide remained concerned about liens on Equity and Mr. Brown's behalf, given the extent of Ms. Kemper's medical bills. Statewide also sent Mr. Brown a letter stating that Equity had settled Ms. Kemper's claim for $25,000. (Dkt. 224-17 at 1.)

Statewide, as the administrator for Equity, responded to Ms. Kemper's demand letter within the time required. (Dkt. 224-13.) It sent her a $25,000 settlement check, a limited release, and a Medicare form for Ms. Kemper to execute and return. (*Id*. at 1.) Statewide stated that it was tendering Mr. Brown's policy limits to settle Ms. Kemper's claim. (*Id*.) Statewide also included the following paragraph in its response.

In concluding the settlement, we are entrusting that you place money in an escrow account in regards to any and all liens pending. This demand is being asserted to protect the lien's interest and in accordance with the recent case law, *Southern General Insurance Co. vs. Wellstar Health System, Inc.*

(*Id.*)

Ms. Kemper's counsel rejected Statewide's counteroffer and returned the check. (Dkt. 224-20 at 1.) He stated that the demand Ms. Kemper place her money in escrow was unacceptable. (*Id.*) He explained, "Ms. Kemper has over one million dollars of medical bills, is catastrophically injured, and she needs this money to live." (*Id.*)

Ms. Kemper later sued Mr. Brown in the Superior Court of Heard County, Georgia. Equity defended him. (Dkt. 252-1 at 58.) The trial court granted Mr. Brown's motion to enforce his purported settlement agreement with Ms. Kemper. The Georgia Court of Appeals, however, reversed holding Statewide's June 5th response to Ms. Kemper's demand letter was a counteroffer, not an acceptance. *See Kemper v. Brown*, 754 S.E.2d 141, 143-44 (Ga. Ct. App. 2014). Because she had not accepted the counteroffer, the court held there was no settlement. *Id.* (concluding the parties reached no binding settlement). Ms. Kemper obtained a $10 million consent judgment against Mr. Brown, and he assigned to her his

good faith failure to settle claim against Equity.  (Dkt. 252-1 at 60, 63.)

She then sued Equity in the State Court of DeKalb County, Georgia, in

July 2015.  (Dkt. 1-1.)  Equity removed the case to federal court.  (Dkt.

1.)

Both Ms. Kemper and Equity have moved for summary judgment.

(Dkts. 235, 239.)  Ms. Kemper has also moved to exclude part of Equity's

expert Attorney J. Randolph Evans's testimony (Dkt. 258) and to

supplement her motion for summary judgment (Dkt. 266).

## II.  Summary Judgment Motions

### A.  Legal Standard

Summary judgment is appropriate when "the movant shows that

there is no genuine dispute as to any material fact and [it] is entitled to

judgment as a matter of law."  FED. R. CIV. P. 56(a).  "No genuine issue of

material fact exists if a party has failed to 'make a showing sufficient to

establish the existence of an element . . . on which that party will bear

the burden of proof at trial.'"  *AFL-CIO v. City of Miami*, 637 F.3d 1178,

1186–87 (11th Cir. 2011) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317,

322 (1986)).  An issue is genuine when the evidence is such that a

reasonable jury could return a verdict for the nonmovant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50 (1986).

The moving party bears the initial responsibility of asserting the basis for his motion. *See Celotex Corp.*, 477 U.S. at 323. The movant is not, however, required to negate the non-movant's claim. Instead, the moving party may meet his burden by "'showing' — that is, pointing to the district court — that there is an absence of evidence to support the nonmoving party's case." *Id*. at 325. After the moving party has carried its burden, the non-moving party must present competent evidence that there is a genuine issue for trial. *Id*. at 324.

The Court views all evidence and factual inferences in a light most favorable to the non-moving party. *See Samples v. City of Atlanta*, 846 F.2d 1328, 1330 (11th Cir. 1988). But the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment. *Anderson*, 477 U.S. at 248. "The requirement is that there be no *genuine* issue of *material* fact." *Id*. The essential question is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided

that one party must prevail as a matter of law." *Anderson,* 477 U.S. at 251–52.

## B. Discussion

The Georgia Supreme Court has held that an insurance company "may be liable for the excess judgment entered against its insured based on the insurer's bad faith or negligent refusal to settle a personal claim within the policy limits." *Cotton States Mut. Ins. Co. v. Brightman*, 580 S.E.2d 519, 521 (Ga. 2003); *see also First Acceptance Ins. Co. of Ga. v. Hughes*, No. S18G0517, 2019 WL 1103831, at *3 (N.D. Ga. Mar. 11, 2019). An insurance company faces liability for bad faith or negligence if it fails to act as "the ordinarily prudent insurer." *Brightman*, 580 S.E.2d at 521 (holding insurer in bad faith failure to settle action "judged by the standard of the ordinarily prudent insurer").

Ms. Kemper has asserted that Equity was negligent and acted in bad faith by failing to settle her claim. (Dkt. 1-1 ¶¶ 48–52.) As the Eleventh Circuit has recognized, Georgia law "is ambiguous . . . as to whether an insured may recover for the insurer's negligent, as well as bad faith, failure to settle." *Delancy v. St. Paul Fire & Marine Ins. Co.,* 947 F.2d 1536, 1547 (11th Cir. 1991). Some Georgia cases imply that

only bad faith is actionable, some blend the two standards, and some explicitly recognize a negligence claim. *Id.* In the end, whether Georgia law allows both claims is largely irrelevant as the difference between negligence and bad faith in this area is "mere terminology" and "semantics." *Id.* at 1548, n.26 (citing *U.S. Fid. & Guar. Co. v. Evans,* 156 S.E.2d 809, 811 (Ga. App. 1967) ("difference between bad faith and negligence is 'mere terminology' and 'means little' ")); *see also Butler v. First Acceptance Ins. Co.*, 652 F. Supp. 2d 1264, 1276 (N.D. Ga. 2009) (analyzing Georgia law). Indeed, the Georgia Court of Appeals recently explained that

> whether the basis for imposing tort liability on the insurer is phrased in terms of bad faith or negligence, an insurer may be liable for damages for failing to settle for the policy limits if, but only if, such ordinarily prudent insurer would consider that choosing to try the case rather than accept an offer to settle within the policy limits would be taking an unreasonable risk that the insured would be subjected to a judgment in excess of the policy limits.

*Baker v. Huff*, 747 S.E.2d 1, 6 (Ga. Ct. App. 2013) (citations, punctuation, and quotation marks omitted).

Ordinarily, a jury must decide whether the insurer acted negligently or in bad faith in failing to settle a claim. *S. Gen. Ins. Co. v. Holt*, 416 S.E.2d 274, 276 (Ga. 1992) (explaining the jury must generally

decide whether an insurer has accorded the insured "the same faithful consideration it gives its own interest"). It must judge the insurance company's actions in the light of "all the relevant circumstances including the insurer's knowledge of facts relevant to liability and damages on the claim; the insurer's diligence in conducting a reasonable investigation to discover the relevant facts; and the terms of the settlement offer and any response by the insurer." *Baker*, 747 S.E.2d at 6.

Georgia courts, however, have provided some guidance about what constitutes an insurance company's bad faith failure to settle. For example, the Georgia Supreme Court has held that "[a]n insurance company does not act in bad faith solely because it fails to accept a settlement offer within the deadline set by the injured person's attorney." *Holt*, 416 S.E.2d at 276. On the other hand, an insurer has a duty to its insured "to respond to a deadline to settle a claim within policy limits *when the [insurer] has knowledge of clear liability and special damages exceeding the policy limits.*" *Id.*; *accord Brightman*, 580 S.E.2d at 521.

It is undisputed that Statewide (acting for Equity) had "knowledge of clear liability and special damages exceeding the policy limits." *See Holt*, 416 S.E.2d at 276. Statewide and its adjuster, Mr. Chop, knew that

Mr. Brown was liable and at fault for causing the accident. (Dkts. 224-1 at 2–3; 224-163; 235-2 at 7; 252-1 at 7–8.) Ms. Kemper and some of her medical providers sent Mr. Chop medical bills from treatment she received after the accident. (Dkts. 116-1 at 53:1–55:1; 223-5 at 2–7, 9–10, 12; 224-6; 224-7; 224-8; 224-9; 252-1 at 10–11.) The bills' total exceeds $25,000. (Dkt. 116-1 at 55:8–9.) Thus, Statewide knew that Mr. Brown faced legal liability from the accident above the $25,000 policy limit. (Dkts. 116-1 at 55:2–13; 252-1 at 12.) Equity's agent Statewide thus had a duty to respond to Ms. Kemper's time-limited demand letter. *See Holt*, 416 S.E.2d at 276.

Ms. Kemper's demand was not Statewide's only legitimate concern, however. Statewide also worried about Equity's potential liability from liens. Under Georgia law, hospitals and physicians who provide medical care to injured people are entitled to a lien for their fees and expenses on any causes of action their patients may have against someone else for those injuries. *See* GA. CODE ANN. § 44-14-470(b); *see also Kennestone Hosp., Inc. v. Travelers Home and Marine Ins. Co.*, 768 S.E.2d 519, 520 (Ga. Ct. App. 2015). To perfect its lien, the hospital or medical provider must provide notice to its patient and "to the best of the claimant's

knowledge" to any other person, firm, or insurance company that the injured person believes are liable for his or her expenses. GA. CODE ANN. § 44-14-471(a)(1). The hospital or medial provider also must file a verified statement setting forth certain required information in the office of the clerk of the superior court in the county or counties in which the medical provider and patient reside. § 44-14-471(a)(1)–(2); *see also Kennestone Hosp., Inc.*, 768 S.E.2d. at 522 ("[T]he phrase to the 'best of the claimant's knowledge' indicates that a notice of lien need not be perfect in all respects."); *Allstate Fire & Casualty Ins. Co. v. Kennestone Hosp. Inc.*, 822 S.E.2d 832, 835 (Ga. Ct. App. 2019) (finding lienholder did not have to send notice to tortfeasor because it exercised due diligence in trying to identify the tortfeasor and his insurer before filing the lien).

The filing of a claim or lien serves as notice of the lien to an insurer, whether or not the insurer received written notice of it. § 44-14-471(b). Such a lien allows a "hospital to step into the shoes of the insured for purposes of receiving payment from the tortfeasor's insurance company for economic damages represented by the hospital bill." *S. Gen. Ins. Co. v. Wellstar Health Sys., Inc.*, 726 S.E.2d 488, 492 (Ga. Ct. App. 2012) (quoting *State Farm Mut. Auto. Ins. Co. v. Adams*, 702 S.E.2d 898, 901

(Ga. 2010)).  Hospital liens essentially become part of an injured party's claim against an insurer.  *Id*. at 495.  If an insurance company pays an injured party's claim after a lienholder perfects its lien, the lienholder may collect against the insurance company.  *See Allstate Fire & Casualty Ins. Co.*, 822 S.E.2d at 835 (affirming trial court's grant of summary judgment against tortfeasor's insurer).  Indeed, under Georgia law, an insurance company can be liable to the lien-holder even it if was unaware of the lien, so long as the lien-holder properly perfected its claim.  *See* § 44-14-471 ("The filing of the claim or lien shall be notice thereof to all persons, firms, or corporations liable for the damages, whether or not they received the written notice provided for in this Code section.").

When Statewide received Ms. Kemper's demand letter it was facing a dilemma.  On the one hand, it knew the Georgia Supreme Court's decision in *Holt* required its client, Equity, to respond to that demand.  It also feared Equity might face a bad faith failure to settle claim if it did not pay Ms. Kemper the full policy amount.  At the very least, Equity would have faced a jury question on bad faith.  *Wellstar,* 726 S.E.2d at 493 (finding insurance company's failure to accept policy limit demand

presents jury question of negligent and bad faith failure to settle when liability is clear and individual's damages exceed policy limit).

On the other hand, Statewide (as Equity's administrator) feared medical liens. It knew Ms. Kemper had extensive medical bills that exceeded the policy limits. (Dkt. 224-1 at 5–6.) Under both Georgia's statutes and its common law, Equity had an obligation to look out for any claims or liens hospitals, physicians, or other medical service providers may have filed upon Ms. Kemper's claims against Mr. Brown, including her claim for the insurance policy limits. *See* § 44-14-470(b); § 44-14-473 (a)–(b); *Wellstar*, 726 S.E.2d at 492. If a lien had been filed before Statewide settled Ms. Kemper's claim, both Mr. Brown and Equity could have been liable for the amount of the lien and the lien holder's attorneys' fees. *See* § 44-14-473(a); *see also Wellstar*, 726 S.E.2d at 491. As a result, Statewide was concerned that it would need to protect Equity and Mr. Brown from any pending liens about which they were unaware. (*See, e.g.*, Dkts. 201 at 59:9–13; 224-1 at 5–6, 8–9.)

Statewide enlisted Mr. Allred and a vendor to search for any liens against Ms. Kemper's insurance claim. (Dkt. 224-16 at 1.) Although the vendor did not send someone to the Coweta County courthouse to

examine its lien books, the vendor found no liens on the county's website. (Dkts. 224-1 at 8; 224-16 at 1.) Statewide also learned that the courthouse only updates its website "every couple of days." (*Id.*) Despite Statewide's efforts to search for any outstanding liens, there was a risk that a lien holder might file and perfect a lien or claim before Statewide settled Ms. Kemper's claim or she signed a release.[1] It had not confirmed the existence of any liens but knew this did not mean there were no liens. (Dkt. 224-1 at 6, 8.) For example, one of Statewide's claim adjusters wrote in the claim file

> MEDS EXCEED OUR LIMITS; EXCESSIVE INJRIES; CLMT NOT ATTY REP'D; NOT SURE HOW TO PROCEED TO HANDLE THEIR WILL BE LIENS PENDING; CLMT HAS MADE A DEMAND FOR US TO PAY HER DIRECTLY[.]

(*Id*. at 6.)

---

[1] Statewide also knew that Ms. Kemper had her own insurance. (Dkts. 223-5 at 12; 224-1 at 4; 224-9 at 1.) That might have made the existence of liens less likely but, because Ms. Kemper had instructed them not to contact her, Statewide could not know for sure. Equity incorrectly argues that Ms. Kemper's employer healthcare plan with Kaiser was self-funded. (Dkt. 239-3 at 5.) It was not. (Dkt. 224-48 at 1.)

Ms. Kemper's demand letter also prohibited Statewide and Equity from contacting her. This is particularly important because a lien holder would have had to give Ms. Kemper actual notice of its potential claim, while it would only have to notify an insurance company like Equity that it knew might be liable to Ms. Kemper. *See* § 44-14-471(a)(1) (requiring that a lien claimant must "provide written notice to the patient and, to the best of the claimant's knowledge, the persons . . . and their insurers."); *see also Allstate Fire & Casualty Ins. Co.*, 822 S.E.2d at 834–35 (affirming a trial court's grant of summary judgment to the lien holder, even though the lien holder did not send notice to the insurer under § 44-14-471(a)). So Ms. Kemper's instruction that Equity not contact her prevented Equity or Statewide from simply asking her whether her insurance company had paid all of her medical bills or whether any liens had been filed. It barred Statewide and Equity from an easy solution to their dilemma.

Georgia law, however, has a safe harbor that protects insurance companies facing these conflicting statutory and common law duties. In *Wellstar,* an insurance company argued that its duty to accept a policy-limits demand under the conditions outlined in *Holt* conflicted with its

duty to satisfy hospital liens. *Wellstar*, 726 S.E.2d at 491. The Court of Appeals disagreed, holding that a Georgia law protects an insurer from liability under *Holt* if "(1) the insurer promptly acts to settle a case involving clear liability and special damages in excess of the applicable policy limits, and (2) the *sole* reason for the parties' inability to reach a settlement is the plaintiff's unreasonable refusal to assure the satisfaction of any outstanding hospital liens" from the proceeds of the settlement. *Id.* at 493. The court also explained that an insurance company can satisfy its good faith obligation to the insured by verifying the validity of outstanding liens, paying those liens, and paying the remainder of the policy limits to the injured complainant. *Id.* at 491, 493–95. It also explained that an insurer could satisfy its obligations by requiring the insured to place money in escrow to satisfy any lien. *Id.*

After reviewing the record and viewing all evidence and factual inferences in a light most favorable to Ms. Kemper, the Court finds that Equity is entitled to the *Wellstar* "safe harbor." The undisputed evidence shows that Statewide promptly acted to settle Ms. Kemper's case, which involved clear liability and special damages above the applicable policy limits. It tried to give Ms. Kemper the $25,000 policy limits on June 5,

2012, three days before the June 8th deadline Ms. Kemper set in her demand letter. (Dkt. 224-13 at 1.) "Statewide *demanded* that Kemper place settlement funds into an escrow account for the purpose of protecting the interests of any pending liens." *Kemper v. Brown*, 754 S.E.2d 141, 144 (Ga. Ct. App. 2014). This demand complies with *Wellstar's* suggestion that an insurance company could "tender its policy limits to the plaintiff, subject to a reasonably and narrowly tailored provision assuring that the plaintiff will satisfy any hospital liens from the proceeds of such settlement payment." *Wellstar*, 726 S.E.2d at 493. Indeed, the Georgia Court of Appeals stated that an "insurance company could request that plaintiff's counsel or a third party hold a portion of the settlement proceeds (in an amount equal to that of the hospital lien) in escrow to allow the plaintiff an opportunity to investigate the validity of the liens and to negotiate with the hospital." *Id.*

Here, the sole reason for the parties' inability to reach a settlement was Ms. Kemper's unreasonable refusal to assure the satisfaction of any outstanding hospital liens from the proceeds of the settlement. Ms. Kemper construed Statewide's response on Equity's behalf as a counteroffer, which she rejected because she found the demand that she

place her money in an escrow account unacceptable as she "need[ed] this money to live." (*Id.*). (Dkt. 224-20 at 1.) Ms. Kemper could have allowed Statewide or Equity to contact her to discuss any outstanding liens, informed them that there were no liens, or signed the affidavit under § 44-14-473(c) in the limited release Statewide provided. (Dkt. 224-13 at 3.) Ms. Kemper did none of these. Instead, she disavowed her obligation to satisfy any potential outstanding liens because she had over one million dollars of medical bills and needed the money to live. (Dkt. 224-20 at 1.)

Ms. Kemper explained that, when she received Equity's administrator Statewide's letter and the check for $25,000, she was "happy." (Dkt. 231 at 104:20–105:3.) She did not know whether her insurance company had paid her medical bills or whether there were any hospital or medical liens against her. (*Id.* at 118:5–8, 119:16–18, 127:1–21.) She intended to put the money in her own bank account and use it to live on. (*Id.* at 79:21–24, 110:9–22.) She might have used it to pay medical bills, buy groceries, or for any other expenses. (*Id.* at 110:17–22.) She did not understand what Statewide meant when it asked and demanded that she place the money in escrow to ensure the payment of

any liens. (*Id*. at 119:1–13.) She contacted the lawyer who had helped her draft her initial demand letter. He did not explain to her what Statewide meant or how Georgia's lien laws worked. (*Id*. at 155: 9–20.) He simply told her that Statewide's request did not "sound right," asked her to send him "everything she had," and told her not to cash the check. (*Id*.) That lawyer then responded to Equity's administrator Statewide, refusing to place the funds in escrow and stating that Ms. Kemper "needs the money to live." (Dkt. 224-20 at 1.) This undisputed evidence shows the parties were unable to resolve Ms. Kemper's claim because of her (and her lawyer's) unreasonable refusal to assure the satisfaction of any outstanding hospital liens or even to allow Statewide or Equity to contact her about the liens. This situation, the possibility of having to pay the insurance policy twice, is exactly why the *Wellstar* safe harbor exists.

Ms. Kemper argues that Equity cannot genuinely claim the *Wellstar* safe harbor because some of Equity's administrator Statewide's employees determined it was unavailable in the absence of verified liens. Indeed, Mr. Chop originally did not include the demand or request that Ms. Kemper place money in an escrow account in an initial draft of the response to Ms. Kemper's demand letter. (Dkt. 116-1 at 69:19–70:22,

73:6–74:6, 75:22–76:6.)  He added that language because his supervisor instructed him to do so, even though he did not fully understand the paragraph he inserted into the letter.[2]  (Dkts. 116-1 at 73:6–74:6; 224-12 at 1.)  And it was the first time Statewide used that language when responding to a demand letter.  (Dkts. 201 at 45:19–25; 205 at 71:14–72:14.)  Nita Malone, a former Statewide claims adjustor, testified that she told Mr. Chop that Statewide's June 5th response letter and the escrow demand or request were inappropriate.  (Dkt. 117-1 at 32:7–33:18.)

Even Statewide's attorney Bill Allred advised Statewide, both before and after it sent its June 5th response letter, that *Wellstar* likely does not apply to Amy Kemper's demand.[3]  (Dkt. 224-168 at 1.)  He wrote, in part:

---

[2] Contrary to Mr. Chop's testimony, Tabatha Whitely, not Dawn McFall, assisted Mr. Chop in drafting the third paragraph in Statewide's June 5th Response letter.  (Dkt. 205 at 79:25–79:10; 224-12 at 1.)

[3] Attorney Allred sent this email on August 9, 2012, more than two months after Statewide sent its response to Ms. Kemper's demand letter.  (Dkt. 224-168 at 1.)  He explained, however, that he discussed the *Wellstar* decision and Ms. Kemper's demand with Statewide before he hired a vendor to find out if any liens had been filed and before he sent that letter.  (*Id.*)

Wellstar likely does not apply to Amy Kemper's demand at all since there were no liens. Even if it did, Statewide did not follow the dictates of the Wellstar decision by first identifying the liens and requesting that claimant protect against them. By adding the escrow language, the tender letter adds a demand, a term, to Amy Kemper's proposal and, as such, is not an acceptance of her demand under the Frickey case (which we also discussed when I was last there — the mirror image rule), but a counteroffer. That is, in Georgia, where the acceptance does not mirror the demand, it is not an acceptance. It is my opinion that an appellate court in this state will agree with Mr. Werner that there was no settlement. Statewide is clearly set up now for a large excess exposure.

(*Id.*)

But, Ms. Kemper did not refuse Equity's counteroffer because no liens existed. Indeed, she testified she did not know whether her insurance company had paid her medical bills or whether any liens existed. Instead, Ms. Kemper refused the counteroffer because she wanted to use the money to live. She disavowed the legal rights of any lien holders to her insurance claim, essentially saying liens did not matter as she needed the money. The undisputed evidence shows that — not knowing whether liens existed — Ms. Kemper refused to assure the satisfaction of any outstanding liens. Thus, the parties reached no settlement because Ms. Kemper refused to assure satisfaction of, or to even discuss the existence of, any outstanding hospital liens.

It may be that *Wellstar* involved actual, verified liens, but the Georgia court's opinion provides a broader manner in which an insurance company may protect itself when faced with competing risks of liability to an insured and liability to potential lien holders. Given the clear priority that lien holders have under Georgia law and the guidance from the Georgia Court of Appeals that Statewide could seek assurance that liens would be satisfied, it was unreasonable for Ms. Kemper to refuse to provide that assurance while also demanding that Equity not contact her. In the light of these facts, Equity's inability to confirm the existence of any lien does not prevent it from obtaining the benefit of the *Wellstar* "safe harbor."

Ms. Kemper also argues that Statewide did not promptly act to settle her claim because, rather than make a proactive offer to settle, Mr. Chop sent a letter to Ms. Kemper asking for information he did not need. (Dkt. 235-1 at 14.) But neither *Wellstar* nor other Georgia law requires an insurer to make a proactive offer to settle. *See Kingsley v. State Farm Mut. Auto. Ins. Co.*, 353 F. Supp. 2d 1242, 1252 (N.D. Ga. 2005) ("[T]o find liability for tortious refusal to settle there must be something the insurer was required to 'refuse.'"), *aff'd* 153 F. App'x 555 (11th Cir. 2005);

*see also Patriot General Ins. Co. v. Krebs*, No. 1:12–CV–0997–RWS, 2012 WL 2990067, at *1 (N.D. Ga. July 20, 2012) (finding insurer was entitled to the *Wellstar* "safe harbor" even though the claimant made a time-limit demand before the insurer offered to settle). "[A]n insurer's duty to settle arises when the injured party presents a valid offer to settle within the insured's policy limits." *First Acceptance Ins. Co. of Ga.*, 2019 WL 1103831, at *3. Moreover, the *Wellstar* court found that an insurer may act promptly and be entitled to the safe harbor even if the insurer makes a "counteroffer (in a timely and reasonable fashion)." *Wellstar*, 726 S.E.2d at 493. Equity's administrator Statewide's response to Ms. Kemper's demand letter was a prompt and timely offer to settle her claim.

The Georgia Court of Appeals laid out a path for an insurance company to follow to avoid bad faith and negligent failure to settle claims. It explained how a company can safely navigate between the liability to its insureds on the one hand and liability to lienholders on the other hand. It explained that an insurance company can tender its policy limits with a "reasonably and narrowly tailored provision assuring that the plaintiff will satisfy any hospital liens." *Id.* It even explained that the insurance company could do this by requesting that the plaintiff hold a

24

portion of the settlement in escrow to assure the payment of liens. *Id.* Equity (through Statewide) followed this path and is entitled to the *Wellstar* "safe harbor." The Court grants Equity's motion for summary judgment.[4]

## III. Plaintiff's Motion to Supplement Her Briefing

Ms. Kemper has requested leave to supplement her brief in opposition to Equity's motion for summary judgment in the light of the Eleventh Circuit's unpublished decision in *Moore v. GEICO General Insurance Company*, 758 F. App'x 726 (11th Cir. 2018) (per curiam). (Dkt. 266.) She also urges the Court to rule that evidence about Attorney Werner's dealings with her uninsured motorist insurance providers ("UM carriers") is inadmissible under Rule 403 of the Federal Rules of Evidence. (Dkt. 266-1 at 4–7.) Equity argues that the Court should not grant Ms. Kemper leave to supplement her briefing because her brief is

---

[4]The *Wellstar* opinion also states that an insurance company can verify the validity of liens, make payments directly to the hospital, and then pay any remaining funds to the plaintiff. *Wellstar,* 726 S.E.2d at 493. The Georgia Court of Appeals did not, however, require this as part of the safe harbor. Indeed, the court explained that when a plaintiff refuses to give assurances that any liens will be satisfied — like Ms. Kemper did here — the insurance company has "no obligation to negotiate with the hospital or otherwise advocate on the plaintiff's behalf." *Id.*

untimely and raises a new issue and arguments about Rule 403 that she had not asserted before.

The supplemental authority Ms. Kemper cites, *Moore v. GEICO*, involved claims that an insurer acted in bad faith by failing to settle a dispute that arose from an automobile accident in Florida. 758 F. App'x at 728. Before trial, the defendant moved to exclude any arguments that it could have settled the underlying claim because plaintiff settled her claims with a third-party insurer. *Id.* at 730. The district court at first denied the motion but later regretted that decision and granted a new trial. *Id.* The Eleventh Circuit affirmed. *Id.* at 733.

The Court grants Plaintiff's motion, and has accepted and considered Ms. Kemper's proffered supplemental authority.[5] The filing of persuasive authority issued after briefing is a well-established practice that helps the Court. *See Hornor, Townsend & Kent, Inc. v. Hamilton*, No. CIV.A.1:01 CV 2979, 2004 WL 2284503, at *11 (N.D. Ga. Sept. 30, 2004). This supplemental authority has not changed the Court's

---

[5] The Court has also considered *First Acceptance Ins. Co. of Ga. v. Hughes*, No. S18G0517, 2019 WL 1103831 (Ga. Mar. 11, 2019), the case Ms. Kemper brought to the Court's attention in her Notice of Supplemental Authority (Dkt. 269).

determination that Equity's motion for summary judgment must be granted. In reaching this decision, the Court did not rely on the evidence Ms. Kemper seeks to exclude. The Court denies Ms. Kemper's motion to exclude this evidence as moot.

## IV.  Conclusion

The Court **GRANTS** Defendant's Motion for Summary Judgment (Dkt. 239). The Court **GRANTS IN PART** and **DENIES IN PART AS MOOT** Plaintiff's Motion to Supplement the Motion for Summary Judgment (Dkt. 266). The Court **DENIES** Plaintiff's Motion for Summary Judgment (Dkt. 235) and **DENIES AS MOOT** Plaintiff's Motion to Exclude in Part, Testimony of J. Randolph Evans (Dkt. 258).

**SO ORDERED** this 8th day of July, 2019.

MICHAEL L. BROWN
UNITED STATES DISTRICT JUDGE